# Exhibit 1

| Approved, SCAO | Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |
|---|---|---|

| STATE OF MICHIGAN | | CASE NO. |
|---|---|---|
| 9th (Kalamazoo)    JUDICIAL DISTRICT<br>JUDICIAL CIRCUIT<br>COUNTY PROBATE | **SUMMONS** | 22- 0282 -CB |

Court address                                                         Court telephone no.

~~227 W. Michigan Ave. Kalamazoo MI 49007~~ 150 E Crosstown Parkway, Kalamazoo, MI 49001      269-383-8837

| Plaintiff's name(s), address(es), and telephone no(s) | | Defendant's name(s), address(es), and telephone no(s) |
|---|---|---|
| Stryker Employment Company, LLC, et al. | v | Jafar Abbas<br>Apt 4ES<br>100 Winston Drive<br>Cliffside Park, NJ 07010 |

**F I L E D**

**Jun 01, 2022**

**9TH JUDICIAL CIRCUIT<br>COUNTY OF KALAMAZOO<br>KALAMAZOO, MICHIGAN**

Plaintiff's attorney, bar no., address, and telephone no.
Andrea J. Bernard (P49209); Jarrod H. Trombley (P83517)
Warner Norcross + JUdd LLP; 150 Ottawa Ave., Ste. 1500
Grand Rapids, Michigan 49503 (616) 752-2199

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**
☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.
☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.
☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**
☑ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.
☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).
☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____ .

The action ☐ remains ☐ is no longer pending

Summons section completed by court clerk.          | SUMMONS |

**NOTICE TO THE DEFENDANT**: In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date | Expiration date* | Court clerk |
|---|---|---|
| June 1, 2022 | August 31, 2022 | |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

**MC 01** (9/19) **SUMMONS**                                 MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

## STATE OF MICHIGAN
## KALAMAZOO COUNTY CIRCUIT COURT

---

STRYKER EMPLOYMENT COMPANY,
LLC, a Michigan limited liability company; and
HOWMEDICA OSTEONICS CORP., a New
Jersey corporation and subsidiary of STRYKER
CORPORATION, a Michigan corporation

    Plaintiff,

v

JAFAR ABBAS, an individual,

    Defendant.

Case No. 22-___0282___-CB

Honorable Alexander C Lipsey

**VERIFIED COMPLAINT FOR *EX
PARTE* TEMPORARY RESTRAINING
ORDER AND OTHER INJUNCTIVE
RELIEF**

---

Andrea J. Bernard (P49209)
Jarrod H. Trombley (P83517)
WARNER NORCROSS + JUDD LLP
150 Ottawa Ave, Suite 1500
Grand Rapids, MI 49503
616.752.2000
Attorneys for Plaintiffs

---

*There is no pending or resolved civil action between these parties arising out of the transaction
or occurrence alleged in this complaint.*

*This case involves a Business or Commercial Dispute under MCL 600.8031 and thus meets the
statutory requirements to be assigned to the Business Court Docket.*

---

   Plaintiffs Stryker Employment Company, LLC and Howmedica Osteonics Corp., a

subsidiary of Stryker Corporation, acting through its Spine Division (collectively, "Stryker

Spine"), by and through its attorneys Warner Norcross + Judd LLP, state their Complaint against

Jafar Abbas ("Abbas") as follows:

## INTRODUCTION

1.       This is an action by Stryker Employment Company, LLC and Howmedica Osteonics Corp. to enforce its employment contract and non-compete agreement against Jafar Abbas, and to protect its Confidential Information and trade secrets from Abbas and Alphatec Spine, Inc. ("Alphatec").   Abbas, a recent former employee of Stryker Spine, intends to join Alphatec, a direct competitor of Stryker Spine that has systematically and maliciously raided the ranks of Stryker Spine's key sales personnel in order to unlawfully access and exploit Stryker Spine's Confidential Information and trade secrets. Abbas is the most recent target in this hunt and, given his role at Stryker Spine, the contacts he made, and his knowledge of Stryker's Spine's most sensitive Confidential Information and trade secrets, his joining Alphatec could cause immense, immeasurable, and irreparable harm to Stryker Spine. Therefore, Stryker Spine is filing this action to ask this Court to enjoin Abbas from joining Alphatec in breach of his noncompete agreement and from otherwise using or disclosing Stryker Spine's Confidential Information and trade secrets.

## PARTIES AND JURISDICTION

2.       Stryker Employment Company, LLC is a Michigan limited liability company with its principal place of business in Kalamazoo County, Michigan.  The sole managing member of Stryker Employment Company is plaintiff Howmedica Osteonics Corp.

3.       Howmedica Osteonics Corp. is a New Jersey corporation with its principal place of business in Mahwah, New Jersey but which regularly conducts business throughout the United States, including in Michigan.  Howmedica is a subsidiary of Stryker Corporation, a Michigan corporation with its principal place of business in Kalamazoo County.

4.       A former employee of Stryker Spine, Abbas is an individual residing in Cliffside Park, New Jersey.  Abbas entered into a confidentiality and noncompete agreement with Stryker Spine, titled the "Stryker Corporation Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement for U.S. Employees" on April 4, 2022 (the "Noncompete Agreement").  (**Exhibit A.**)  This Noncompete Agreement is similar to an earlier noncompete agreement between the parties which Abbas signed at the outset of his employment with Stryker Spine.

5.       This Court has jurisdiction over the parties and this dispute in accordance with Section 8.2 of the Noncompete Agreement.  (Ex. A.)

6.       Venue is also proper in this Court under Section 8.2 of the Noncompete Agreement. (Ex. A.)

7.       This Court has jurisdiction over this matter because it involves a dispute in excess of $25,000 and because Stryker Spine seeks equitable relief.

8.       Business Court is proper under MCL 600.8031(2)(d).

## GENERAL ALLEGATIONS

9.       Stryker Spine incorporates its allegations contained in the preceding paragraphs as if fully stated herein.

10.      Stryker Spine is a global leader in the development, manufacture and sale of spinal implants, instruments, and related products and services.

11.      Stryker Spine invents, designs, manufactures, and sells a full range of spinal-related implants and products which make surgeries and recoveries simpler, faster, and more effective.

12.      Stryker Spine products have broad appeal and acceptance in the marketplace and within the spinal surgery community.

3

ABBAS' EMPLOYMENT WITH STRYKER SPINE

13.     Stryker Spine hired Abbas on July 15, 2013, as an Associate Manager of Finance.

14.     Upon joining Stryker Spine, and as a condition of his employment, Abbas was required to, and did, execute a Stryker Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement on July 15, 2013. The terms of this agreement were substantially the same as the terms of the updated Noncompete Agreement that Abbas later signed on April 4, 2022 in exchange for a stock option and restricted stock units award for Stryker Corporation. (Ex. A).

15.     The July 15, 2013 agreement and the Noncompete Agreement that followed were necessary to protect Stryker Spine's customer goodwill, confidential information, trade secrets, and legitimate business interests. From the time he was hired and through his separation from Stryker Spine, Abbas received numerous promotions, pay increases, increases in responsibility, and most importantly, increased access to Stryker Spine's Confidential Information and trade secrets.

16.     Most recently, on January 1, 2021, Stryker Spine transitioned Abbas to the position of Sales Operations Manager.

17.     As Sales Operations Manager, Abbas' was responsible for leading various projects and tasks associated with customer sales and financing; developing calculation and reporting tools; building trusted relationships inside and outside Stryker Spine, with customers, distributors, and sales representatives; influencing decisions with customers; driving urgency on critical priorities; having an advanced understanding of spine business and its competition; and working with the sales and marketing leadership teams to identify domestic sales issues and analyze and communicate recommendations for improvement throughout the U.S. based on customer, geography, sales representatives, surgeons, and/or products, when applicable.

4

18.     In his duties as Sales Operations Manager and throughout his employment with Stryker Spine, Abbas had access to, regularly analyzed, and made use of significant amounts of Stryker Spine's Confidential Information and trade secrets.

19.     For example, Abbas was responsible for cross-divisional collaboration between Stryker Spine's enabling technology and core implant business units, coordinating the work of the finance and sales departments as it related to the placement of navigation systems and instruments and implant commitments with Stryker Spine's customers via the highly successful Acquiring Capital Equipment ("ACES") program. Abbas was often a key player in closing ACES deals with Stryker Spine customers.    Through the ACES program, Abbas gained deep familiarity with customer needs and with the costs, benefits, sales margins, and profits for Stryker Spine's products associated with the ACES program specifically, and Stryker Spine's business strategy at large.

20.     Abbas was also a key player in Stryker Spine's upgrade strategy, a breakoff of the ACES program, working with customers in often multi-million-dollar deals to upgrade instrument and machine placements at those customers' locations.

21.     While working on the ACES, upgrade, and other programs for Stryker Spine, Abbas would regularly present, sell, and negotiate unique financing options with customers and, in the course of such discussions, made regular contacts with C-suite officers and other decision-makers at Stryker Spine's customers.

22.     As the Sales Operations Manager and in prior roles, Abbas regularly participated on a weekly team call with Enabling Technology's VP of Sales and the regional sales managers for Stryker Spine and thereby learned detailed information regarding Stryker Spine's nationwide sales and marketing strategies, customer targets, and sales goals. Abbas also was introduced to and worked with all of Stryker Spine's sales representatives throughout the United States.

23. Because he worked so closely with Stryker Spine's sales representatives, and because of his reporting duties as the Manager of Sales Operations, Abbas also had particularized knowledge of and familiarity with Stryker Spine's sales compensation structure and commissions plans.

24. From May 16, 2022, to May 19, 2022, just days before his resignation, and well after he knew he would be leaving Stryker Spine, Abbas attended a regional sales meeting and training for Q Guidance, a navigation system that Stryker Spine will soon be launching ("Q Guidance Meeting"). At this Q Guidance Meeting, Stryker Spine provided training on product nuances associated with Q Guidance that are not known to the public. Stryker Spine also internally unveiled a confidential product in the initial stages of development. This product is expected to be a major clinical differentiator with no direct competitor in the market.

25. At the Q Guidance Meeting, Abbas led a training with the strategic sales team focusing on ACES best practices and the use of Sales Force, a software used by Stryker sales representatives for pricing, quoting, and to find business prospects. Abbas also discussed confidential strategy with Stryker Spine Sales representatives regarding how to outmaneuver and beat Stryker Spine's competitors.

26. Abbas was also responsible for generating various reports at Stryker Spine, including without limitation, ACES reporting, product price/volume/mix reporting, and outstanding auto-replenishment orders reporting, and he became familiar with the results of those reports and thus the economic and inventory position of Stryker Spine and its customers.

27. Abbas also had full access to and regularly utilized PowerBI, the sales management platform and database where all Stryker Spine customer sales information, forecasting, quotas, and commission structures were managed and stored.

28.     All of the confidential information, trade secrets and relationships that Abbas

learned and regularly utilized in the execution of his day-to-day functions as an employee of

Stryker Spine is precisely the type of Confidential Information that is protected by Abbas'

Noncompete Agreement with Stryker Spine:

> "Confidential Information" means know-how, trade secrets, and
> technical, business and financial information and any other non-
> public information in any way learned by me, disclosed to me or
> developed by me during my employment with Stryker, including,
> but not limited to (a) prices, renewal dates and other detailed terms
> of customer or supplier contracts and proposals; (b) information
> concerning Stryker's customers, clients, referral sources and
> vendors, and potential customers, clients, referral sources and
> vendors, including, but not limited to, names of these entities or
> their employees or representatives, preferences, needs or
> requirements, purchasing or sales histories, or other customer or
> client-specific information; (c) supplier and distributor lists; (d)
> pricing policies, methods of delivering services and products, and
> marketing and sales plans or strategies; (e) products, product know-
> how, product technology and product development strategies and
> plans; (f) employees, personnel or payroll records or information;
> (g) forecasts, budgets and other non-public financial information; (h)
> acquisitions, divestitures, expansion plans, management policies and
> other business strategies; (i) inventions, research, development,
> manufacturing, purchasing, finance processes, technologies,
> machines, computer software, computer hardware, automated
> systems, methods, engineering, marketing, merchandising, and
> selling; and (j) information belonging to third parties which has been
> disclosed to Stryker in confidence. Confidential Information shall
> not include information that is or becomes part of the public domain,
> such that it is readily available to the public, through no fault of
> mine.

(Ex. A, Section 2.2.)

29.     Moreover, Abbas acknowledged both the existence and significance of this

Confidential Information to Stryker Spine:

> I recognize that Confidential Information is of great value to
> Stryker, that Stryker has legitimate business interests in protecting
> its Confidential Information, and that the disclosure to anyone not
> authorized to receive such information, including any entity that

7

competes with Stryker, will cause immediate irreparable injury to Stryker. Unless I first secure Stryker's written consent, I will not disclose, use, disseminate, identify by topic or subject, lecture upon or publish Confidential Information. I understand and agree that my obligations not to disclose, use, disseminate, identify by subject or topic, lecture upon or publish Confidential Information shall continue after the termination of my employment for any reason.

(Ex. A, Section 5.1.)

30.     Accordingly, Abbas agreed as follows:

During my employment with Stryker and during the [twelve-month period following termination of my employment with Stryker, regardless of the reason for termination],[1] I will not work (as an employee, consultant, contractor, agent, or otherwise) for, or render services directly or indirectly to, any Conflicting Organization in which the services I may provide could enhance the use or marketability of a Conflicting Product or Service by application of Confidential Information which I have had access to during my employment or while working for a Stryker agency... If I accept employment with a Conflicting Organization, I will provide Stryker written assurances satisfactory to Stryker that indicate that I will not render services directly or indirectly, during the Restricted Period, in connection with any Conflicting Product or Service. I understand that Stryker may also require written assurances from the Conflicting Organization. I also agree that during my employment with Stryker and during the Restricted Period, I will not render services to any organization or person in a position similar in responsibilities to any position I held with Stryker during the twenty-four (24) months prior to the termination of my employment with Stryker for any reason or in any position in which I could use Confidential Information to the detriment of Stryker.

(Ex. A, Section 6.3(a).)

31.     Section 6.4 of the Noncompete Agreement also provides:

I agree that during my employment with Stryker and during the Restricted Period, I will not, directly or indirectly, solicit, induce or influence, or attempt to solicit, induce or influence, any person engaged as an employee, independent contractor or agent of Stryker to terminate his, her or its employment and/or business relationship with Stryker or do any act which may result in the impairment of the

---

[1] The "Restricted Period." *See*, Ex. A., Section 2.8.

8

relationship between Stryker and its employees, independent contractors or agents.

(Ex. A.)

32.    Section 6.6 of the Noncompete Agreement provides:

To enable Stryker to monitor my compliance with the obligations imposed by this Agreement, I agree to notify Stryker in writing before I commence employment with a new employer of the identity of my new employer (if any) and of my job title and responsibilities, and will continue to so inform Stryker, in writing, any time I accept or change employment during the Restricted Period. I shall provide this notice to the Human Resource lead for the division or location I last worked for Stryker. I agree Stryker is also permitted to contact any new or prospective employer regarding my obligations owed to Stryker.

(Ex. A.)

33.    Section 2.4 of the Noncompete Agreement defines Conflicting Organization as:

[A]ny person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a Conflicting Product or Service..

(Ex. A.) Section 2.3 of the Noncompete Agreement in turn defines Conflicting Product or Service

as:

[A]ny product, process, technology, machine, invention or service of any person or organization other than Stryker in existence or under development which is similar to, resembles, competes with or is intended to resemble or compete with a product, process, technology, machine, invention or service upon which I have worked or about which I was knowledgeable during the last twenty-four (24) months of my employment with Stryker or while providing products or services to a Stryker customer.

(Ex. A.)

34.     Stryker Spine and Abbas enjoyed significant economic advantages and success due to Stryker Spine's Confidential Information and trade secrets that were acquired by Abbas while he was employed by Stryker Spine.

35.     The economic advantages associated with the Confidential Information and trade secrets known by Abbas were largely derived from the fact that this information is not known to or readily ascertainable by competitors.

36.     Stryker Spine has employed numerous measures to protect its Confidential Information and trade secrets, including requiring employees and contractors to execute confidentiality agreements, placing password protection on computers and other electronic devices, and by initiating lawsuits across the United States to protect its Confidential Information and trade secrets.

**ALPHATEC SYSTEMATICALLY AND TORTIOUSLY RAIDS STRYKER SPINE'S SALES OPERATIONS**

37.     The spinal surgery industry in which Stryker Spine operates is highly competitive. Alphatec Spine Inc. ("Alphatec"), a Delaware corporation with its principal place of business in Carlsbad, California, is one of Stryker Spine's direct competitors for spinal implants and related products.

38.     Since at least 2018, Alphatec has embarked on a strategy to systematically and unlawfully misappropriate Stryker Spine's Confidential Information, trade secrets, customer goodwill, and talent by raiding Stryker Spine's key sales operations and tortiously interfering with Stryker Spine's third-party business relationships.  Alphatec's efforts are part of a wide-ranging, malicious, and systematic plan which has resulted in significant reductions in Stryker Spine's U.S. sales force, and misappropriation of Stryker Spine's trade secrets and valuable customer information, causing damage to Stryker Spine's relationships and reputation.

39.     Indeed, Pat Miles, Alphatec's CEO has publicly stated that it is his intent to rely upon the "Stryker prowess from a sales force know-how standpoint" in order to build Alphatec's client base and salesforce.

40.     Alphatec leadership has also touted that 9 of its 11 senior sales leaders, who are responsible for recruiting sales representatives across the country, came to Alphatec from Stryker Spine and are the baseline ingredient of Alphatec's so-called "Disciplined Approach to Service."

41.     Upon information and belief, Alphatec's actions are part of a nation-wide scheme to misappropriate Stryker Spine's Confidential Information, trade secrets, customer goodwill, and talent and to tortiously interfere with its customer relationships by inducing Stryker Spine personnel to leave Stryker and share the company's trade secrets, thereby giving Alphatec an unfair competitive advantage.

42.     Alphatec's solicitation of Stryker Spine's sales force poses harm that goes far beyond monetary losses. Stryker Spine's former sales representatives have maliciously exploited Stryker Spine's confidential and proprietary information to compete unfairly against Stryker Spine on behalf of Alphatec. Armed with this information, Alphatec has enjoyed an unfair advantage in targeting Stryker Spine's customers and employees, and acquired a valuable roadmap for designing and improving its own products, customer relationships and goodwill. Essentially, Alphatec seeks to misappropriate decades of Stryker Spine's client development and customer service techniques in order to unfairly shortcut its own success at Stryker Spine's expense.

43.     To protect its trade secrets and enforce its contractual relationships, Stryker Spine is currently engaged in litigation with Alphatec and others related to Alphatec's unlawful activities, including: a lawsuit pending in the United Stated District Court for the Middle District of Florida, titled *Howmedica Osteonics Corp. v. Alphatec Spine, Inc.* (3:21-cv-00789); a lawsuit

pending in the United States District Court for the District of New Jersey titled *Howmedica Osteonics Corp. v. Howard et al.* (2:19-cv-19254); and a lawsuit pending in the United States District Court for the District of New Jersey titled *Howmedica Osteonics Corp. v. William Lewers, et al.* (2:20-cv-14310) (collectively, the "Alphatec Litigation Matters").

44.     Given his extensive knowledge of Stryker Spine's sales and financial operations, Abbas was called upon and personally assisted Stryker Spine's legal team with compiling reports and information related to Stryker Spine's litigation strategy and damages in the Alphatec Litigation Matters including, without limitation, working with counsel to compile financial and sales information associated with certain surgeons throughout the United States. As a result, Abbas is familiar with key components of Stryker Spine's litigation strategy involving Alphatec – particularly those related to profits and losses.

**ABBAS RESIGNS STRYKER SPINE TO JOIN ALPHATEC**

45.     In the summer of 2021, as part of its nationwide scheme to raid Stryker Spine, Alphatec attempted to recruit Abbas away. Upon information and belief, Alphatec's initial efforts were unsuccessful. However, On May 20, 2022, Abbas resigned from Stryker Spine and told his supervisor, the Director of Financial Operations for Stryker Spine, that he was leaving to take a position with Alphatec.

46.     This statement was consistent with the exit interview Abbas gave on his last day at Stryker Spine, in which he reported to Stryker's Human Resources department that he was leaving Stryker Spine to accept a position as Alphatec's Director of Strategy.

47.     Abbas told his supervisor on May 20, 2022, that he would be reporting to Alphatec's Vice President of Sales, David Sponsel – also a former employee of Stryker Spine, in his new role.

12

48.     Abbas also told his Stryker supervisor that in his Director of Strategy position for Alphatec he would be responsible for understanding the sales landscape on behalf of Alphatec, for setting the direction of sales goals, and that a portion of his compensation at Alphatec would be tied to successful sales results in the United States.

49.     Even knowing he was resigning from Stryker Spine, and being intimately familiar with the confidential and sensitive nature of the weekly regional sales manager calls, on his last day at Stryker Spine, Abbas asked Stryker Spine's U.S. Director of Strategic Sales to be allowed on this weekly call.

50.     Given that Abbas' gaining deeper familiarity with Stryker Spine's sales goals and related Confidential Information and trade secrets would no longer benefit Stryker Spine with Abbas leaving, Stryker Spine found this request suspicious and concerning. As a result, the Director of Strategic Sales denied Abbas' request to join the call.

51.     The spinal surgery industry is highly competitive, and Alphatec is one of Stryker Spine's direct competitors for spinal implants and related products.

52.     Alphatec and Stryker Spine regularly compete to place implants in the same hospitals – often in the same hospitals in which Stryker Spine has placed, or is negotiating to place, capital equipment which aids in the sale of implants, a sales strategy that Abbas is deeply familiar with through the ACES and other programs at Stryker Spine.

53.     Alphatec provides Conflicting Products and Services within the meaning of Sections 2.3 and 6.3 of the Noncompete Agreement.

54.     Alphatec is a Conflicting Organization within the meaning of Sections 2.4 and 6.3 of the Noncompete Agreement.

13

55.    Abbas' extensive knowledge of Stryker Spine's Confidential Information and trade secrets may or will enhance the use or marketability of Alphatec's Conflicting Products and Services.

56.    More specifically, Alphatec would benefit from knowing and having access to financial information related to Stryker Spine's sales efforts such as pricing, profit margins, sales volume, and target customers. Abbas has come to know and understand all of that information through his work for Stryker Spine, which will become accessible to Alphatec if Abbas begins working for Alphatec, thereby enhancing the use and marketability of Alphatec's competing spinal implant products.

57.    Alphatec would benefit from knowing and having access to Stryker Spine's confidential customer information, such as customer targets for the ACES and upgrade programs, customer needs and buying patterns, product mix and marketability, and the identity of and contact information for customer decision-makers. Abbas has come to know and understand all of that information through his work for Stryker Spine, which will become accessible to Alphatec if Abbas begins working for Alphatec, thereby enhancing the use and marketability of Alphatec's competing spinal implant products.

58.    Alphatec would benefit from knowing and having access to Stryker Spine's direct and indirect sales representative and distributor relationships, as well as information related to Stryker Spine's sales commission and compensation programs, which Alphatec could then use to solicit Stryker Spine representatives to join Alphatec, a tactic that Alphatec has used on many occasions in the past. Abbas has come to know and understand all of this information through his work for Stryker Spine, which will become accessible to Alphatec if Abbas begins working for

Alphatec, thereby enhancing the use and marketability of Alphatec's competing spinal implant products.

59.     By accepting employment at Alphatec, Abbas has violated Section 6.3 of the Noncompete Agreement.

60.     On May 24, 2022, Stryker Spine emailed Abbas a letter reminding him of his obligations under the Noncompete Agreement. **(Exhibit B.)** Pursuant to section 6.5 of the Noncompete Agreement, Stryker Spine also asked Abbas to report on his title and job duties. (*Id.*) On May 27, 2022, Stryker Spine emailed Abbas again, attaching the May 24, 2022 letter and a copy of his Noncompete Agreement and reiterated its demand that Abbas provide a written description of his position and job duties at Alphatec and also demanded that Abbas not begin working at Alphatec while it investigates this matter further. **(Exhibit C.)**

61.     Abbas acknowledged receipt of the May 24, 2022 letter but did not immediately respond with a complete job description.

62.     Instead, on May 31, 2022, Alphatec's Legal Affairs & Litigation Director responded on Abbas' behalf and attached a summary of Abbas' Alphatec duties and responsibilities. **(Exhibit D.)**

63.     Rather than assuage Stryker Spine's concerns, the May 31, 2022 job description deepened them. Abbas' new job description makes clear that he will be performing essentially the same duties for Alphatec that he previously performed for Stryker Spine, including developing sales strategy and customer relationships, developing sales force compensation and commission plans, and developing customer financing relationships and strategies. Among other things, Abbas will be performing the following duties for Alphatec that he also performed for Stryker Spine:

- Developing tracking metrics for and evaluating performance of existing methods and models to increase market share. Approaching, finding, attracting and maintaining

15

new business relationships. Providing input on and assisting in the development of new methods and models.

- Developing tracking metrics for and evaluating performance of existing Customer Service and Field Operations methods and models for delivery and utilization of capital and field inventory to meet demand. Providing input on and assisting in the development of new Customer Service and Field Operations methods and models.

- Developing tracking metrics for and evaluating performance of existing support functions essential to sales force productivity, including planning, reporting, quota setting and sales compensation design and administration. Providing input on and assisting in the development of new methods and models.

- Identifying, evaluating, and engaging third-party financing/leasing partners for supporting capital acquisition initiatives.

- Engaging targeted providers to secure new business as well as enhancing penetration and retention and profitability of existing direct business.

- Assisting with assessing new territories and distributors, building business cases, and tracking performance of competitive hires.

- Directing and evaluating implementation and execution of Alphatec sales policies and practices.

- Delivering improvements to sales strategies based on market research and competitive awareness.

- Providing input to senior leadership in the development and administration of sales incentive compensation programs and management of sales incentive plans.

- Assisting in the equitable assignment of sales force quotas and ensuring quotas are optimally allocated to all sales channels and resources.

- Evaluating and recommending system improvements. Serving as department resource on all relevant database projects, upgrades, process enhancements, and other systems improvements.

- Assisting with collection and dissemination of feedback provided by customers.

- Compiling and presenting on department metrics to Alphatec's Senior Leadership.

- Attending and participating in designated sales meetings, training programs, conventions, and trade shows. (Ex. D.)

More importantly, Abbas will perform all of the foregoing duties for Alphatec while knowing and being in a position to act upon Stryker Spine's Confidential Information and trades secrets gathered during his

16

9+ years working for Stryker Spine, including most recently as the Stryker Spine Sales Operations Manager.

64.     Abbas' resignation and move to Alphatec is the result of Alphatec's unlawful corporate raiding strategies.  It is also a breach and violation of Abbas' own independent duties to Stryker Spine, both under Michigan law and under the Noncompete Agreement.

65.     Upon information and belief, Abbas is influencing and/or will influence other employees, independent contractors, and/or agents of Stryker Spine, either directly or indirectly, to leave Stryker Spine to join Alphatec.  When leaving Stryker Spine, Abbas called numerous other employees and agents of Stryker Spine, including sales representatives, to inform them of his intent to join Alphatec.

66.     Abbas influencing Stryker Spine employees, independent contractors, and agents to join Alphatec is and will be a violation of Section 2.4 of the Noncompete Agreement.

67.     Upon information and belief, Abbas has used or disclosed or inevitably will use or disclose Stryker Spine's Confidential Information and trade secrets for the benefit of Alphatec, his new employer.

68.     Given Abbas' role as Director of Strategy at Alphatec, and Abbas' deep familiarity with key pieces of Stryker Spine's Confidential Information and trade secrets, it is indisputable that Abbas will lead Alphatec in strategic directions designed to outmaneuver Stryker Spine by using or disclosing Stryker Spine's Confidential Information and trade secrets.

69.     Abbas' use of this information constitutes misappropriation of trade secrets in violation of the Michigan Uniform Trade Secrets Act (MUTSA) and also constitutes a violation of Section 5.1 of the Noncompete Agreement.

70. Given that Abbas has communicated and coordinated with Stryker Spine's attorneys in connection with the Alphatec Litigation Matters, including providing information in support of Stryker Spine's litigation position and damage calculations, and that he is familiar with Stryker Spine's litigation position and strategy in those matters, Stryker Spine's Confidential Information and Trade Secrets consisting of attorney-client privilege and work product are at risk of being invaded if he is permitted to have written or verbal *ex parte* communications with the attorneys who represent Alphatec or the other defendants in those matters.

## COUNT I
## BREACH OF CONTRACT

71. Stryker Spine incorporates its allegations contained in the preceding paragraphs as if fully stated herein.

72. The Noncompete Agreement constitutes a valid and binding contract between Stryker Spine and Abbas.

73. Abbas breached Section 6.3 of the Noncompete Agreement by accepting employment at Alphatec—a Conflicting Organization—within twelve (12) months following his resignation from Stryker Spine.

74. Abbas' using or disclosing Stryker Spine's Confidential Information and trade secrets to Alphatec, whether intentional or not, constitutes a breach of Section 5.1 of the Noncompete Agreement.

75. Abbas' solicitation and intended solicitation of Stryker Spine employees, independent contractors, and agents to join Alphatec constitutes a violation of Section 6.4 of the Noncompete Agreement.

76. These breaches will cause Stryker Spine irreparable damage and injury in an amount that will be exceedingly difficult to calculate but which will surely exceed $25,000.

**COUNT II**
**MISAPPROPRIATION OF TRADE SECRETS**
**MICHIGAN UNIFORM TRADE SECRETS ACT, MCL 445.1901 *ET SEQ.***

77.     Stryker Spine incorporates its allegations contained in the preceding paragraphs as if fully stated herein.

78.     Abbas gained access to significant amounts of Stryker Spine's trade secrets while employed at Stryker Spine including, but not limited to, customer lists, customer needs, customer contacts, past and present negotiations, sales targets, sales strategies, compensation structures of sales representatives, sales representative contact information, financial data, pricing, sales margins, financing strategies, incentive programs, litigation strategies, privileged information, and product launches.

79.     None of the trade secrets Abbas had access to were generally known or readily ascertainable by Stryker Spine's competitors or others.

80.     Stryker Spine enjoys significant economic advantages from trade secrets, of which Abbas is knowledgeable, and from those trade secrets being unknown and difficult to ascertain.

81.     Stryker Spine takes numerous actions to protect its trade secrets including requiring employees to execute confidentiality and noncompetition agreements, such as the Noncompete Agreement, placing password protection on computers and other electronic devices, and by initiating lawsuits to protect its business interests and trade secrets, such as in the Alphatec Litigation Matters.

82.     Abbas has misappropriated Stryker Spine's trade secrets by bringing them, intentionally or unintentionally, with him to a known competitor.

83.     Given Abbas' deep knowledge of these trade secrets from his work as Stryker Spine's Sales Operations Manager and Abbas' current role as the Director of Strategy at Alphatec,

19

it is inevitable that Abbas will use or disclose Stryker Spine's trade secrets for the benefit of Alphatec and to the detriment of Stryker Spine.

84.     That Abbas intends to use or disclose this information is evidenced by the fact that Abbas attended the Q Guidance Meeting and attempted to join the weekly sales call with the regional sales managers with foreknowledge that he would be leaving Stryker Spine and joining Alphatec and thus would need *none* of the information from these meetings for Stryker Spine's benefit.  These actions demonstrate Abbas' clear intent to gain additional knowledge of Stryker Spine's Confidential Information and trade secrets to enhance his value to Alphatec.

85.     Abbas' actual and threatened misappropriation of trade secrets will cause Stryker Spine irreparable damage and injury in an amount that will be exceedingly difficult to calculate but which will surely exceed $25,000.

86.     This Court has authority to (see, e.g. MCL 445.1903) and should enjoin Abbas from using or disclosing Stryker Spine's trade secrets and from working for Alphatec where he will inevitably use or disclose those trade secrets.

87.     Additionally, while working for Stryker Spine, Abbas generated work product, communicated with Stryker Spine's counsel, and learned of litigation strategies and positions relevant to the Alphatec Litigation Matters, all of which constitute Confidential Information and trade secrets.

88.     Abbas must not be permitted to have written or verbal *ex parte* discussions that are related in any way to Stryker Spine or Abbas' prior employment with Stryker Spine with any attorneys who represent Alphatec or any other parties in the Alphatec Litigation Matters, because Stryker Spine's privilege and litigation strategy in those litigation matters are at risk of being violated if any such communications occur.

89.     In particular, Abbas could disclose insights and strategies of Stryker Spine and its counsel to the attorneys who represent Alphatec while under the guise of purported attorney-client discussions on behalf of his new employer Alphatec.

90.     This Court should therefore enter an order enjoining and prohibiting Abbas from having any *ex parte* discussions with any attorneys who represent Alphatec or any of the other defendants in the Alphatec Litigation Matters.

WHEREFORE, Stryker Spine requests that this honorable Court:

A.     Grant a Temporary Restraining Order, without notice, and thereafter a preliminary and permanent injunction prohibiting Abbas: (a) from working for Alphatec or any other Conflicting Organization for a period of twelve (12) months from entry of the order; (b) from using or disclosing Stryker Spine's Confidential Information or trade secrets; (c) from soliciting Stryker Spine's employees, independent contractors, and agents to leave Stryker Spine on behalf of Alphatec or otherwise; and (d) from having any *ex parte* communications with any attorneys who represent Alphatec or any other defendants in the Alphatec Litigation Matters, or otherwise disclosing any privileged or strategic information related to Stryker Spine or its litigation strategies in those matters.

B.     Order Abbas to return all of Stryker Spine's Confidential Information and trade secrets currently in his possession.

C.     Award Stryker Spine its costs and attorney fees in this action, in an amount to be determined in excess of $25,000.

D.     Allow both parties to participate in expedited discovery during the period prior to the hearing on the Order to Show Cause, including depositions and subpoenas duces tecum.

E.     Grant such other relief as the Court deems just and equitable, including exemplary damages.

STRYKER EMPLOYMENT COMPANY, LLC
HOWMEDICA OSTEONICS CORP.

By _____

By: Nicholas Mead
Its: Vice President of Finance for the Spine Division

STATE OF VIRGINIA

COUNTY OF LOUDOUN

On this 1st day of June, 2022, before me personally appeared Nicholas Mead, who did swear that he is the Vice President of Finance for the Spine Division of Howmedica Osteonics Corp. that he knows the contents of the foregoing Complaint signed by him, that the same is true and correct to the best of his knowledge, information and belief.

_____

Notary Public, LOUDOUN County, VIRGINIA
My commission expires: NOV 30, 2024
Acting in the County of: LOUDOUN

WARNER NORCROSS + JUDD LLP

Dated: June 1, 2022

By _____

Andrea J. Bernard (P49209)
Jarrod H. Trombley (P83517)
WARNER NORCROSS + JUDD LLP
150 Ottawa Ave, Suite 1500
Grand Rapids, MI 49503
616.752.2000
Attorneys for Plaintiff

22

# EXHIBIT A

## STRYKER CORPORATION
## CONFIDENTIALITY, INTELLECTUAL PROPERTY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT FOR U.S. EMPLOYEES

In addition to other good and valuable consideration, I am expressly being given employment, continued employment, a relationship with Stryker Corporation (and/or its subsidiaries, divisions and affiliates, as well as any of their respective parents, predecessors, successors and assigns referred to collectively as "Stryker"), certain monies, bonuses, compensation increases, benefits, training, promotion, equity grants and/or trade secrets and confidential information of Stryker and its customers, suppliers, vendors or affiliates to which I would not have access but for my relationship with Stryker in exchange for my agreeing to the terms of this Agreement. In consideration of the foregoing, I agree as follows:

### INTRODUCTION AND ACKNOWLEDGEMENTS

1.1 **Acknowledgment.** I acknowledge and agree that the business in which Stryker is engaged is extremely competitive and that during my employment with Stryker I have received and will receive and have access to materials and information regarding Stryker's technologies, know-how, products, services, customers and sales that are proprietary and confidential to Stryker and for which Stryker has spent and will continue to spend substantial time and monies developing and providing training. I recognize that these materials and information are an important and valuable asset to Stryker and that Stryker has a legitimate interest in protecting the confidential and proprietary nature of these materials, information, technologies, products and services. Stryker has provided and will be providing me with Confidential Information during my employment and the opportunity to contribute to the creation of Confidential Information, which will assist both Stryker and me in competing effectively. Stryker also has dedicated its time and resources developing and maintaining relationships with existing and potential customers, clients, referral sources, agents, distributors, employees and vendors. During my employment with Stryker, I understand that Stryker expects me to continue to develop and maintain these relationships on its behalf. I recognize that these relationships are an important and valuable asset to Stryker and that Stryker has a legitimate interest in protecting these relationships.

1.2 **Purpose of Agreement.** For the reasons identified herein, this Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement for U.S. Employees (the "**Agreement**") is designed to protect the legitimate interests of all of the various businesses that comprise Stryker.

1.3 **Terms of Agreement and Modifications.** This Agreement, including the items in Attachment A ("State Law Modifications") shall remain in effect during my employment with Stryker even if my position or job location changes or I transfer from one Stryker business to another.

### DEFINITIONS

As used in this Agreement:

2.1 The "**Company**" or "**Stryker**" means collectively, Stryker Corporation including any of its subsidiaries, divisions, and affiliates and their respective parents, predecessors, successors, assigns, purchasers and acquirers, to which I may be transferred or by which I may be employed in the future, wherever located.

2.2 "**Confidential Information**" means know-how, trade secrets, and technical, business and financial information and any other non-public information in any way learned by me, disclosed to me or developed by me during my employment with Stryker, including, but not limited to (a) prices, renewal dates and other detailed terms of customer or supplier contracts and proposals; (b) information concerning Stryker's customers, clients, referral sources and vendors, and potential customers, clients, referral sources and vendors, including, but not limited to, names of these entities or their employees or representatives, preferences, needs or requirements, purchasing or sales histories, or other customer or client-specific information; (c) supplier and distributor lists; (d) pricing policies, methods of delivering services and products, and marketing and sales plans or strategies; (e) products, product know-how, product technology and product development strategies and plans; (f) employees, personnel or payroll records or information; (g) forecasts, budgets and other non-public financial information; (h) acquisitions, divestitures, expansion plans,

management policies and other business strategies; (i) inventions, research, development, manufacturing, purchasing, finance processes, technologies, machines, computer software, computer hardware, automated systems, methods, engineering, marketing, merchandising, and selling; and (j) information belonging to third parties which has been disclosed to Stryker in confidence. Confidential Information shall not include information that is or becomes part of the public domain, such that it is readily available to the public, through no fault of mine.

2.3    **"Conflicting Product or Service"** means any product, process, technology, machine, invention or service of any person or organization other than Stryker in existence or under development which is similar to, resembles, competes with or is intended to resemble or compete with a product, process, technology, machine, invention or service upon which I have worked or about which I was knowledgeable during the last twenty-four (24) months of my employment with Stryker or while providing products or services to a Stryker customer. For clarity, if I worked in a service position (e.g., ProCare) during the last twenty-four (24) months of my employment, Conflicting Product or Service includes any product, process, technology, machine, invention or service of any person or organization other than Stryker in existence or under development which is similar to, resembles, competes with or is intended to resemble or compete with a product, process, technology, machine, invention or service used in any procedure in which I provided service or support on behalf of Stryker.

2.4    **"Conflicting Organization"** means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a Conflicting Product or Service. For clarity, if I worked in a service position (e.g., ProCare) during the last twenty-four (24) months of my employment, Conflicting Organization includes the customer(s) for whom I provided service during the last twenty-four (24) months of my employment.

2.5    **"Copyrightable Works"** means all works of authorship, fixed in any tangible medium of expression now known or later developed, that I prepare within the scope of my employment with Stryker, including, but not limited to, writings, reports, graphics, computer programs, user interfaces, drawings, designs, documentation and publications.

2.6    **"Employer"** means any entity of Stryker that employs me or any other entity included within the definition of "Stryker" to which I may be transferred or by which I may be employed in the future.

2.7    **"Intellectual Property"** means all inventions, patents, patent applications, designs, discoveries, innovations, ideas, know-how, trade secrets, methods, specifications, procedures, and/or improvements, whether patentable or not, Copyrightable Works, trademarks, mask works, certifications, or invention disclosures.

2.8    **"Restricted Period"** means the twelve-month period following termination of my employment with Stryker, regardless of the reason for termination.

2.9    **"Stryker Customer"** means any of the current or prospective accounts, customers, doctors, hospitals, group purchasing organizations, integrated delivery networks or clients, with whom I have had direct or material contact during the last twenty-four (24) months of my employment with Stryker and/or with a Stryker agency or about whom I learned Confidential Information during my employment with Stryker and/or with a Stryker agency, including, but not limited to: (a) any customer that purchased Stryker products or services, (b) any prospect that received or requested a proposal to purchase Stryker products or services, (c) any affiliate of any such customer or prospect, or (d) any of the individual customer or prospect contacts that I established, serviced, sold to, attended training or seminars with or learned confidential information about. For clarity, I agree that Stryker Customers also includes all customers of the agency, branch or division to which I was or am assigned and with which I have had direct or material contact, serviced, trained, learned Confidential Information about or participated in customer development activities.

## PERFORMANCE FOR STRYKER

3.1    **Loyalty and Best Efforts.** During my employment with Stryker, I will devote my best efforts, attention and energies to the performance of my duties as an employee of Stryker.

3.2    **Conflicts of Interest.** I agree to abide by the provisions of Stryker Corporation's Code of Conduct, including, but not limited to, the provisions regarding Conflicts of Interest. As such, during the term of my employment with

Page 2

Stryker, I will not engage in any activity or have any outside interest that might deprive Stryker of my loyalty, interfere with the satisfactory performance of my duties, or be harmful or detrimental to Stryker or be engaged in any other occupation, professional or business activity that conflicts with my obligations to Stryker or provide any services that competes with Stryker. I understand that I am required to immediately notify the executive in charge of my division or the CEO of any potential conflict of interest involving me.

**3.3. Sale of Stryker Property**. I will not sell, give away or trade for my own benefit or for or on behalf of any person or entity other than Stryker, any items that are the property of Stryker. Stryker property includes, but is not limited to, samples, inventory, customer trade-ins (which includes trade-ins of Stryker and non-Stryker Products), training materials, promotional materials, handbooks, correspondence files, business card files, customer and prospect lists, price lists, product lists, software manuals, technical data, forecasts, budgets, notes, customer information, employee information, employee names, phone lists, organizational charts, product information and/or Confidential Information acquired by me in the course of my employment by Stryker. The requirements of this <u>Section 3.3</u> apply to Stryker Property even if the property is obsolete or has been fully amortized, depreciated or expensed byStryker.

## INVENTIONS

4.1     **Disclosure of Developments**. I agree that during and subsequent to my employment with Stryker, I will promptly disclose and furnish complete information to Stryker relating to all inventions, improvements, modifications, discoveries, methods, and developments, whether patentable or not, made or conceived by my or under my direction during my employment whether or not made or conceived during normal working hours or on the premises of Stryker.

4.2     **Intellectual Property is Stryker Property.**

(a)     I agree to assign and hereby assign to Stryker all title, interests and rights including intellectual property rights worldwide in and to any and all Intellectual Property (including, as defined above, patents and patent applications) made, conceived, developed, reduced to practice, or authored by me alone or with others during the course of my employment which are within the scope of Stryker's actual or anticipated business.

(b)     My agreement to assign Intellectual Property rights, as set forth above, shall not apply to any Intellectual Property that was conceived and developed without the use of Stryker's equipment, supplies, facilities, and trade secret information and which was developed entirely on my own time, unless (a) the Intellectual Property relates (i) directly to the business of Stryker, or (ii) to Stryker's actual or anticipated research or development, or (b) the Intellectual Property results from any work performed by me for Stryker.

(c)     I agree, however, that Stryker shall have a nonexclusive, fully paid license to use for all purposes any Intellectual Property within the scope of Stryker's actual or anticipated business but not assigned to Stryker under Paragraph 4.2(b), unless such a license is prohibited by statute or by a court of last resort and competent jurisdiction.

4.3     **Copyrightable Works.** I recognize that all Copyrightable Works shall to the fullest extent permissible be considered "works made for hire" in the United States as defined in the U.S. Copyright Laws and in any other country adhering to the "works made for hire" or similar notion. All such Copyrightable Works shall from the time of creation be owned solely and exclusively by Stryker throughout the world. If any Copyrightable Work or portion thereof shall not be legally qualified as a work made for hire in the United States or elsewhere, or shall subsequently be held to not be a work made for hire, I agree to assign and do hereby assign to Stryker all of my right, title and interest to the Copyrightable Works and all registered and applied for copyrights therein. I hereby waive any moral rights which I may hold in any Copyrightable Works or other Intellectual Property, as an author worldwide.

4.4     **Employee Cooperation.** When requested to do so by Stryker, either during or subsequent to my employment with Stryker, I will (a) execute all documents requested by Stryker for the vesting in Stryker of the entire right, title and interest in and to the Intellectual Property and Confidential Information, and all patent, copyright, trademark, or other applications filed and issuing on the Intellectual Property; (b) execute all documents requested by Stryker for filing and obtaining of patents, trademarks, or copyrights; and (c) provide assistance that Stryker reasonably requires to protectits

Page 3

Stryker Corporation Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement for U.S. Employees: v. 2, effective January 1, 2020

right, title and interest in the Intellectual Property and Confidential Information, including, but not limited to, providing declarations and testifying in administrative and legal proceedings with regarding to Intellectual Property and Confidential Information. Whenever requested to do so by Stryker, I shall execute any applications, assignments or other instruments which Stryker shall consider necessary to apply for and obtain Letters Patent, trademark and/or copyright registrations in the United States or any foreign country, or to otherwise protect Stryker's interests. These obligations shall continue beyond the termination of my employment with Stryker with respect to Intellectual Property conceived, authored or made by me during my period of employment, and shall be binding upon my executors, administrators or other legal representatives.

4.5     **Prior Intellectual Property.** I have attached to this Agreement as Attachment B ("List of Prior Intellectual Property") a complete list of what I represent to be all Intellectual Property made, conceived or first reduced to practice by me, alone or jointly with others, prior to my employment with Stryker ("Prior Intellectual Property"). If no such Prior Intellectual Property List is attached to this Agreement, I represent that I have no such Prior Intellectual Property at the time of this Agreement. If in the course of my employment, including any entity that competes with Stryker, will cause machine any Prior Intellectual Property, then I hereby grant, and agree to grant, Stryker a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license to make, modify, use, and sell such Prior Intellectual Property as part of or in connection with such product, process, or machine.

## CONFIDENTIAL INFORMATION AND PROPERTY

5.1     **Non-disclosure of Confidential Information.** I recognize that Confidential Information is of great value to Stryker, that Stryker has legitimate business interests in protecting its Confidential Information, and that the disclosure to anyone not authorized to receive such information, including any entity that competes with Stryker, will cause immediate irreparable injury to Stryker. Unless I first secure Stryker's written consent, I will not disclose, use, disseminate, identify by topic or subject, lecture upon or publish Confidential Information. I understand and agree that my obligations not to disclose, use, disseminate, identify by subject or topic, lecture upon or publish Confidential Information shall continue after the termination of my employment for any reason.

5.2     **Return of Information and Materials.** Upon termination of my employment with Stryker for any reason whatsoever, or at any time requested by Stryker, I will immediately return to Stryker any and all Confidential Information and any and all information and material relating to Stryker's business, products, personnel, suppliers or customers, whether or not such material is deemed to be confidential or proprietary. Thereafter, any continued possession will be deemed to be unauthorized. I shall not retain any copies of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents in any form whatsoever (including information contained in computer memory or on any computer disk) relating in any way to the affairs of Stryker and which were entrusted to me or obtained by me at any time during my employment with Stryker.

5.3     **Return of Stryker Property.** Upon termination of my employment with Stryker for any reason whatsoever, or at any time requested by Stryker, I will return to Stryker any and all property in my possession which belongs to Stryker, including the following: all keys and security and credit cards; all equipment, products, samples, inventory, tools, computers, software, cell phones and other electronic devices; all customer files, account files, price lists, product information, training manuals, promotional materials and handbooks; and all other documents relating to Stryker's business, products, personnel, suppliers and customers.

## NON-SOLICITATION AND NON-COMPETE

6.1     **Employee Acknowledgement.** I recognize that Stryker's relations with Stryker Customers represent an important business asset that results from Stryker's significant investment of its time and resources. I further acknowledge that my position with Stryker exposes me to Confidential Information and more generally to a segment of business with respect to which I may have had no prior exposure before joining Stryker. I further recognize that by virtue of my employment by Stryker, I have gained relationships with Stryker's Customers, and because of such relationships, I will cause Stryker great loss, damage, and immediate irreparable harm, if I should for myself or on

Page 4

Stryker Corporation Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement for U.S. Employees: v. 2, effective January 1, 2020

behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a Conflicting Product or Service as stated in this Agreement.

6.2     **Non-Solicitation of Customers and Supplier.** I agree that during my employment with Stryker and during the Restricted Period, I will not, in any capacity, directly or indirectly, personally or through another person, (i) solicit, contact or sell any Conflicting Product or Service to a Stryker Customer; (ii) ) solicit, contact or sell any product or service to a Stryker Customer that competes with or is similar to any Stryker product or service; (iii) divert, entice or otherwise take away from Stryker the business or patronage of any Stryker Customer; or (iv) solicit or induce any vendor, supplier or Stryker Customer to terminate or reduce its relationship with Stryker.

6.3     **Non-Compete.**

(a)     During my employment with Stryker and during the Restricted Period, I will not work (as an employee, consultant, contractor, agent, or otherwise) for, or render services directly or indirectly to, any Conflicting Organization in which the services I may provide could enhance the use or marketability of a Conflicting Product or Service by application of Confidential Information which I have had access to during my employment or while working for a Stryker agency. This provision shall not bar me from accepting employment with a Conflicting Organization whose business is diversified and which is, as to that part of its business in which I accept employment, not a Conflicting Organization. If I accept employment with a Conflicting Organization, I will provide Stryker written assurances satisfactory to Stryker that indicate that I will not render services directly or indirectly, during the Restricted Period, in connection with any Conflicting Product or Service. I understand that Stryker may also require written assurances from the Conflicting Organization. I also agree that during my employment with Stryker and during the Restricted Period, I will not render services to any organization or person in a position similar in responsibilities to any position I held with Stryker during the twenty-four (24) months prior to the termination of my employment with Stryker for any reason or in any position in which I could use Confidential Information to the detriment of Stryker.

(b)     If I hold a research and development position with Stryker, I agree that during my employment with Stryker and during the Restricted Period I shall not hold a position with a competitor in which I will research or develop any product or service similar to products or services of Stryker for which for which I had research or development responsibilities during the twenty-four (24)-month period prior to the termination of my employment with Stryker or about which I learned Confidential Information.

(c)     Notwithstanding Section 6.3(a) hereof, if at the time of the termination of my employment, my responsibilities include: sales or service, case coverage, servicing products or assisting with sales or service, case coverage or servicing product within a geographic area, territory, branch or assigned customer accounts, then the post-employment restrictions set forth in Section 6.3(a) hereof shall include and be limited to (i) the geographic area, territory, branch and assigned customer accounts that, directly or indirectly, was covered either by me or by employees, distributors, agents or representatives who reported to me at any time during such twenty-four (24) month period preceding the termination of my employment; and/or (ii) any geographic area, territory, branch and assigned customer accounts to which I provided services, covered cases, made proposals, made sales or serviced products whether directly or indirectly, at any time during such  twenty-four (24) month period preceding the termination of my employment.

(d)     During the Restricted Period, Section 6.3 shall apply if, during the last twenty-four months of employment, I worked in a sales or service role (e.g., ProCare, field service) or in a role that Stryker classified as salaried or exempt.

6.4     **Non-Solicitation of Employees.** I agree that during my employment with Stryker and during the Restricted Period, I will not, directly or indirectly, solicit, induce or influence, or attempt to solicit, induce or influence, any person engaged as an employee, independent contractor or agent of Stryker to terminate his, her or its employment and/or business relationship with Stryker or do any act which may result in the impairment of the relationship between Stryker and its employees, independent contractors or agents.

Page 5

Stryker Corporation Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement for U.S. Employees: v. 2, effective January 1, 2020

6.5 **Employee Obligation to Notify Stryker of Work for New Employer.** To enable Stryker to monitor my compliance with the obligations imposed by this Agreement, I agree to notify Stryker in writing before I commence employment with a new employer of the identity of my new employer (if any) and of my job title and responsibilities, and will continue to so inform Stryker, in writing, any time I accept or change employment during the Restricted Period. I shall provide this notice to the Human Resource lead for the division or location I last worked for Stryker. I agree Stryker is also permitted to contact any new or prospective employer regarding my obligations owed to Stryker.

6.6 **Modification of Non-Compete and Non-Solicitation Provisions.** The provisions of this Agreement shall be severable and if any provision of this Agreement is found by any court to be unenforceable, in whole or in part, the remainder of this Agreement shall nevertheless be enforceable and binding on the parties. I also agree that a court or arbitrator may modify any invalid, overbroad or unenforceable term of this Agreement so that such term, as modified, is valid and enforceable under applicable law and is authorized to extend the length of this Agreement for any period of time in which I am in breach of this Agreement or as necessary to protect the legitimate business interests of Company.

## REPRESENTATIONS; ACKNOWLEDGEMENTS

7.1 **Code of Conduct.** I acknowledge receipt of Stryker Corporation's Code of Conduct and confirm that I have read and understand the Code of Conduct. I further agree to abide by and support the policies set forth in the Code of Conduct and understand that compliance with the Code of Conduct, as it may be amended by Stryker from time to time, is a condition of my continued employment.

7.2 **No Violation of Agreements with Prior Employers.** I have not signed any non-competition or other agreement that I have not disclosed to Stryker that prohibits me from being employed by Stryker or assigning works and ideas to Stryker ("**Non-Compete Agreement**"). I agree that I will not disclose to Stryker or use for Stryker's benefit any information that to my knowledge is proprietary or confidential to any of my prior employers, without proper consent from the prior employer. If I have signed a Non-Compete Agreement with a prior employer, I have provided a copy of that agreement to Stryker's Human Resources Department under separate cover.

7.3 **Medicare, Medicaid Participation; Fraud and Abuse.** I (a) have not been excluded or debarred from participation in any Federal or State Health Care Program (including Medicare, Medicaid, or CHAMPUS) or other state or federal governmental program, and (b) have not committed any acts which are cause for exclusion or debarment from participation in any such program. In addition, no entity in which I serve as a managing employee or officer, or currently have a direct or indirect ownership or control interest (c) has been excluded or debarred from participation in any Federal or State Health Care Program (including Medicare, Medicaid, or CHAMPUS), or (d) has committed any acts which are cause for exclusion or debarment from participation in any such program.

7.4 **Disclosure.** An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in confidence to a Federal, State, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law. An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal; and does not disclose the trade secret, except pursuant to court order.

7.5 **At-Will Employment.** I understand that this Agreement does not obligate me to remain employed by Stryker nor does it confer upon me the right to continued employment by Stryker. Stryker and I each have the right to terminate the employment relationship at any time, for any or no reason, with or without notice and with or without cause.

7.6 **Provisions are Reasonable.** I acknowledge and agree that it is reasonable and necessary for the protection of the goodwill and continued business of Stryker that I abide by the covenants and agreements contained in this

Page 6

Stryker Corporation Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement for U.S. Employees: v. 2, effective January 1, 2020

Agreement during and following my employment with Stryker and that Stryker will suffer irreparable injury, loss, harm and damage if I engage in conduct prohibited in this Agreement. My experience and abilities are such that compliance with this Agreement will not cause any undue hardship or unreasonable restriction on my ability to earn a livelihood and that the restrictions on my activities during and after employment do not prevent me from using skills in any business or activity that is not in competition with Stryker.

7.7     **Duty of Loyalty.** Nothing herein shall limit or reduce my common law duties to Stryker, including but not limited to my duty of loyalty.

## MISCELLANEOUS

8.1     **Remedies.** I recognize that any breach by me of Sections 4, 5 or 6 of this Agreement will cause Stryker irreparable harm that cannot be compensated adequately by an award of monetary damages. Consequently, I agree: (a) that Stryker is entitled to specific performance and injunctive relief in addition to money damages at law without the posting of a bond if I breach or threaten to breach this Agreement; (b) that a court or arbitrator shall extend the Restriction Periods in this Agreement for any period of time in which I am in breach or as required to protect Stryker's legitimate business interests; and (c) that Stryker will be entitled to recover from me its reasonable attorneys' fees and costs for any action that it successfully brings for my breach or threatened breach of this Agreement. All remedies for enforcement of this Agreement shall be cumulative and not exclusive.

8.2     **Governing Law and Venue.** Although I may work for Stryker in various locations, I agree and consent that this Agreement shall be interpreted and enforced as a contract of Michigan and shall be interpreted and enforced in accordance with the internal laws of that state without regard to its conflict of law rules. In such circumstance, I agree and consent that any and all litigation between Stryker and me relating to this Agreement will take place exclusively in Michigan and I consent to the jurisdiction of the federal and/or state courts of that state. I consent to personal jurisdiction and venue in both such Courts and to service of process by United States Mail or express courier service in any such action. By signing this Agreement, I represent and warrant that I have been advised to and/or have consulted with an attorney and that the attorney and/or myself agree to the terms herein including, but not limited to, the terms of this paragraph.

8.3     **Validity of Provisions.** I expressly agree that the provisions contained herein are fair and reasonable limitations as to time, geographical area and scope of activity, and such restrictions do not impose a greater restraint than is necessary to protect the goodwill and other business interests of Stryker. To the extent any portion of this Agreement, or any portion of any provision of this Agreement is held to be invalid or unenforceable, it shall be construed by limiting and reducing it so as to contain the maximum restrictions permitted by applicable law. All remaining provisions of this Agreement, and/or portions thereof, shall remain in full force and effect. I have been provided an adequate amount of time to seek legal counsel before executing this Agreement and agreeing to its terms.

8.4     **Waiver.** I acknowledge that the failure of Stryker to insist upon strict compliance of this Agreement shall not be deemed a waiver of any of its rights.

8.5     **Transfer or Renewal of Employment.** This Agreement will be deemed to continue during any periods of renewal of my employment, including, but not limited to, periods of employment following promotions or transfers, or during any subsequent re-employment by Stryker.

8.6     **Binding Effect and Assignability.** I may not assign any of my obligations under this Agreement. I acknowledge that my obligations will continue beyond the termination of my employment and are binding upon my assigns, executors, administrators, and other legal representatives. I hereby consent and agree to assignment by Stryker of this Agreement and all rights and obligations hereunder, including, but not limited to, an assignment in connection with any merger, sale, transfer or acquisition consummated by Stryker or any of its subsidiaries, affiliates or divisions, or relating to all or part of its assets or the assets of its subsidiaries, affiliates or divisions.

8.7     **Independence of Obligations.** Each of my obligations to be performed under this Agreement shall be interpreted independent of (i) any other provisions of this Agreement, and (ii) any other obligation Stryker may have

Stryker Corporation Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement for U.S. Employees: v. 2, effective January 1, 2020

toward me. The existence of any claims I have or may have against Stryker, whether based on this Agreement or otherwise, shall not be a defense to the enforcement of any my obligations under this Agreement.

**8.8    Trial by Court.** I agree that in any legal action relating to this Agreement and/or my obligations under this Agreement, I waive my right to a trial by jury.

**8.9    Notice.** Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be mailed by pre-paid certified mail, return receipt requested, or by Federal Express or other similar overnight delivery service providing proof of delivery, to Stryker at your division's headquarters to the attention of your division's HR leader, and to me at my last known address. All notices shall be effective on the date sent in accordance with this provision.

**8.10    Interpretation.** I acknowledge that the terms of this Agreement will not be interpreted or construed in favor of me on the basis that Stryker was the drafter of this Agreement. This Agreement shall be construed as a whole and in accordance with its fair meaning.

**8.11    Entire Agreement.** This document, including its two attachments [Attachment A "State Law Modifications," Attachment B "List of Prior Intellectual Property"] contains the entire agreement of the parties related to the matters addressed in this Agreement. This Agreement may not be modified orally but only in writing by the Chief Human Resources Officer for Stryker. This Agreement supersedes any and all prior agreements between the parties with respect to the matters addressed in this Agreement.

**8.12    Prior Agreements.** Except as may be stated herein, I agree and acknowledge that this Agreement supersedes prior agreements between me and Stryker with respect to the subject matter addressed in this Agreement.

BY SIGNING BELOW, I ACKNOWLEDGE THAT I HAVE READ THE AGREEMENT AND ITS ATTACHMENTS AND UNDERSTAND AND AGREE TO EACH OF THEIR PROVISIONS.

_Jafar Abbas_

Electronically signed
by Jafar Abbas
Reason I approve
the document
Date: Apr 4, 2022
16:57 EDT

EMPLOYEE'S SIGNATURE

## Jafar Abbas

PRINT NAME

DATE: 04-Apr-2022

Page 8

Stryker Corporation Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement for U.S. Employees: v. 2, effective January 1, 2020

# ATTACHMENT A

## State Law Modifications

The purpose of this Attachment A to the Agreement is to modify certain terms of this Agreement as described herein. This Attachment A supplements and is intended to be read in conjunction with the Stryker Corporation Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement for U.S. Employees, even though it may be received separately. This Attachment A will be updated from time to time, to reflect changes in the scope of employment.  For purposes of this Agreement, the Employee is employed in only one state at any given time.

**WHILE THE EMPLOYEE IS EMPLOYED IN LOUISIANA**

The following is added to Sections 6.2 and 6.3 of the Agreement:

During the Restricted Period, this covenant shall apply in the following parishes:_____.

## ATTACHMENT B

### List of Prior Intellectual Property

# Jafar_Abbas_3272076_Noncompete

Final Audit Report                                           2022-04-04

| | |
|---|---|
| Created: | 2022-03-08 |
| By: | Daniel Guillen (daniel.guillen@stryker.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAUQQiovyEtywFWG_eU2Qh1xxMSiLkgB1- |

## "Jafar_Abbas_3272076_Noncompete" History

🔖 Document created by Daniel Guillen (daniel.guillen@stryker.com)
   2022-03-08 - 4:01:08 PM GMT

✉ Document emailed to Jafar Abbas (jafar.abbas@stryker.com) for signature
   2022-03-08 - 4:02:29 PM GMT

🔖 Email viewed by Jafar Abbas (jafar.abbas@stryker.com)
   2022-04-04 - 4:51:17 PM GMT- IP address: 52.154.71.15

✍ Document e-signed by Jafar Abbas (jafar.abbas@stryker.com)
   Signature Date: 2022-04-04 - 8:57:02 PM GMT - Time Source: server- IP address: 52.154.71.15

✅ Agreement completed.
   2022-04-04 - 8:57:02 PM GMT

# EXHIBIT B

**Jasmine Cerpas**
**Human Resources Coordinator**

**stryker**®
_____
**Spine**

Stryker Spine
600 Hope Parkway SE
Leesburg, VA 20175 USA
Jasmine.Cerpas@stryker.com

May 24, 2022

**SENT VIA E-MAIL**
Jafar Abbas
100 Winston Drive
Apt 4ES
Cliffside Park, NJ 07010
jafar.abbas51@gmail.com

RE:   Stryker Corporation Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement

Dear Jafar,

This letter notifies and reminds you of your post-employment obligations under your Stryker Corporation Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement for US Employees (the "Agreement") dated July 15, 2013, with Stryker Spine, a division of Stryker Corporation (the "Company" or "Stryker"). All post-employment obligations are not outlined, but rather are summarized for your review and to serve as a reminder. You are encouraged to review the entire Agreement and are responsible for adhering to all obligations thereof. Pursuant to Sections 6.2, 6.3 and 6.4 of your Agreement, you have certain obligations not to, directly or indirectly, whether as an employee, consultant, contractor, agent or in any other capacity take any of the following actions during the Restrictive Period:

- Directly or indirectly (i) solicit, contact or sell any Conflicting Product or Service (as that term is defined to a Stryker Customer (as that term is defined); (ii) solicit, contact or sell any product or service to a Stryker Customer that competes with or is similar to any Stryker product or service; (iii) divert, entice or otherwise take away from Stryker the business or patronage of any Stryker Customer; or (iv) solicit or induce any vendor, supplier or Stryker Customer to terminate or reduce its relationship with Stryker.

- Work for, or render services directly or indirectly to, any Conflicting Organization in (i) the geographic area, territory, branch and assigned customer accounts that, directly or indirectly, was covered either by me or by employees, distributors, agents or representatives who reported to me at any time during such twenty-four (24) month period preceding the termination of my employment; and/or (ii) any geographic area, territory, branch and assigned customer accounts to which I provided services, covered cases, made proposals, made sales or serviced products whether directly or indirectly, at any time during such twenty-four (24) month period preceding the termination of my employment.

- Solicit, induce or influence, or attempt to solicit, induce or influence, any person engaged as an employee, independent contractor or agent of Stryker to terminate his, her or its employment and/or business relationship with Stryker or do any act which may result in

the impairment of the relationship between Stryker and its employees, independent contractors or agents.

To monitor your compliance with the Agreement, Section 6.5 of your Agreement requires that during the 12-month period beginning on your termination date, you must:

- Notify Stryker in writing before commencing employment with a new employer of the identity of the new employer (if any) and of your job title and responsibilities, and will continue to so inform Stryker, in writing, any time you accept or change employment during the Restricted Period; and
- Notice shall be provided to the Human Resource lead for the division or location in which you last worked for Stryker.

In addition, your Agreement with the Company sets forth your continuing legal obligation not to use or disclose to others any of the Company's Confidential Information. Any use or disclosure by you of any of the Company's Confidential Information may subject you to civil and criminal liabilities under various federal and state laws, including laws that prohibit the misappropriation and theft of trade secrets.

Should Stryker learn of any actions that are in violation of these agreements and/or your intent to do so, it is prepared to take steps to vigorously enforce its rights and to pursue all equitable and legal remedies available to it.

Sincerely,

*Jasmine Cerpas*

Jasmine Cerpas
Human Resources Coordinator

Enclosures

# EXHIBIT C

**Trombley, Jarrod**

| | |
|---|---|
| **From:** | Ahmad, Tanzeela <tanzeela.ahmad@stryker.com> |
| **Sent:** | Friday, May 27, 2022 9:38 AM |
| **To:** | jafar.abbas51@gmail.com |
| **Subject:** | RE: Stryker Post-Employment Obligations |
| **Attachments:** | Separation NC Reminder Letter - Jafar Abbas.pdf; Jafar Abbas Stock Award Non Compete.pdf |

Dear Jeff,

I'm following up concerning the letter sent to you by HR earlier this week regarding your non-compete agreement. I've reattached the letter here, along with a copy of your most recent non-compete agreement.

As I'm sure you know, Stryker expects its former employees to fully abide by their obligations under their non-compete agreements. Stryker has significant concerns about the role you've accepted with Alphatec, given the scope of your role at Stryker and your access to Stryker's confidential information. Accordingly, Stryker demands that you and Alphatec immediately provide the information requested in the May 24 correspondence from HR. In particular, you must provide a written description of your anticipated job duties with Alphatec. Stryker further demands that you delay your start date with Alphatec and refrain from providing any services to them until this matter has been concluded to Stryker's satisfaction.

Your prompt compliance with the foregoing demands is required. Given the seriousness of these matters and the potential for irreparable harm to Stryker, please respond with the requested information as soon as possible, and no later than noon (Eastern) on Tuesday, May 31, 2022.

As a reminder, you are directed to ensure that all documents, records, evidence, electronic data and metadata related to these issues (including your Stryker employment, your pursuit of employment with ATEC, your hiring by ATEC, your communications with former Stryker personnel about your ATEC employment, your job responsibilities and duties at ATEC, and your work for ATEC) are preserved and are not altered, destroyed or compromised in any way whether in hard copy or electronic format. This preservation obligation includes all potentially relevant data, documents, and information stored within your business and personal email accounts, computers, external computer storage devices, PDAs, cell phones and other devices. If you delete or destroy any such information, Stryker will deem it a willful and intentional spoliation of evidence and seek appropriate relief.

Thank you,

Tanzeela

**Tanzeela Ahmad**
**Employment Counsel**
**Stryker**
P 571 919 2145
tanzeela.ahmad@stryker.com

**CONFIDENTIALITY and PRIVILEGE NOTICE: The information contained in this email message and any attachments originated from Stryker Corporation's Legal Department, is covered by the Electronic Communications Privacy Act, 18 USC §2510 et seq., and is exclusively for the use of the intended recipient. It may contain legally privileged, confidential information or work product subject to attorney-client privilege or otherwise protected from disclosure. No waiver of any privilege is intended. If you are not the intended recipient, any interception, dissemination, distribution or copying is strictly prohibited, and may subject you to criminal and/or civil penalties. If**

1

you have received this email message in error, please notify the sender by telephone at 571.919.2145 or by email reply and confirm that you will destroy or delete all copies of the message and any attachments from your system.

**From:** CERPAS, JASMINE
**Sent:** Tuesday, May 24, 2022 2:07 PM
**To:** jafar.abbas51@gmail.com
**Cc:** Ross, Beth <beth.ross@stryker.com>
**Subject:** Stryker Post-Employment Obligations

Hi Jafar,

This email and its attachment serve as notification of your post-employment obligations under your Stryker Corporation Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement.

Please review and contact me with any questions. Thank you!

Best,

Jasmine **Cerpas** (she/her)
**Human Resources Coordinator**
**Spine**
600 Hope Parkway SE
Leesburg, VA 20175
Jasmine.Cerpas@stryker.com

**For Workday, benefits, payroll, vendor credentialing, or policy questions, please reach out to myHR at myhr.stryker.com or 1-877-795-2002**

This email may contain confidential and/or private information. If you received this email in error please delete and notify sender.

DocuSign Envelope ID: B4F1955D-931C-472D-A51D-31038BC52CEA

# Dir, Corporate Strategy



| Job Code | Job Family | Job Location |
|---|---|---|
| **M6268** | **Sales** | **Carlsbad, CA** |

## SUMMARY

The Director of Corporate Strategy is responsible for the ongoing process and procedural evaluations of current sales, field, customer service, and corporate account initiatives, and the development of tools and strategies to streamline operations and drive overall greater efficiencies in use of corporate resources.  S/he evaluates and supports initiatives in operational logistics and sales channel development and management.  S/He supports and collaborates with the Vice President of Sales, the Sales Management Team, Contracts Group, Customer Service, Field Operations, and all other internal departments to develop and implement company-wide strategies which meet business objectives.

## ESSENTIAL DUTIES AND RESPONSIBILITIES

- Develops tracking metrics for and evaluates performance of existing methods and models to increase market share, approach, find, attract and maintain new business relationships (i.e. Young Alpha Program). Provides input on and assists in the development of new methods and models.
- Develops tracking metrics for and evaluates performance of existing Customer Service and Field Operations methods and models for delivery and utilization of capital and field inventory (i.e. surgical set activities for loaner pool, trial, and consignment) to meet demand.  Provides input on and assists in the development of new Customer Service and Field Operations methods and models.
- Develops tracking metrics for and evaluates performance of existing support functions essential to sales force productivity, including planning, reporting, quota setting and sales compensation design and administration.  Provides input on and assists in the development of new methods and models.
- Identifies, evaluates, and engages third-party financing/leasing partners for supporting capital acquisition initiatives.
- Engages targeted providers to secure new business as well as enhancing penetration and retention and profitability of existing direct business

DocuSign Envelope ID: B4F1955D-931C-472D-A51D-31038BC52CEA

- Assists with assessing new territories and distributors, building business cases, and tracking performance of competitive hires.
- Directs and evaluates implementation and execution of ATEC sales policies and practices.
- Delivers improvements to sales strategies based on market research and competitive awareness.
- Provides input to senior leadership in the development and administration of sales incentive compensation programs and management of sales incentive plans.
- Assists in the equitable assignment of sales force quotas and ensures quotas are optimally allocated to all sales channels and resources.
- Evaluates and recommends system improvements. Serves as department resource on all relevant database projects, upgrades, process enhancements, and other systems improvements.
- Assist with collection and dissemination of feedback provided by customers.
- Establishes and maintains effective working relationships with all support departments within the Company (i.e., Sales Administration, Customer Service, Field Operations, Legal, Finance, Medical Education.).
- Regularly compiles and presents on department metrics to supervisor and other members of Senior Leadership as needed.
- Works within the Departmental Operational Budget. Initiates corrective actions as necessary. Analyzes and controls expenditures of all regions to conform to budgetary requirements.
- Attends and participates in designated sales meetings, training programs, conventions, and trade shows.
- Performs other duties as assigned.

## SUPERVISORY RESPONSIBILITIES

None

## QUALIFICATIONS

The requirements listed below are representative of the knowledge, skill, and/or ability required. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

- A full and complete knowledge of the medical marketplace, healthcare systems and the ability to continuously evaluate trends and adjust strategy to compensate and take advantage of shifts in the Marketplace.
- Specific knowledge of orthopedic medical devices, particularly spinal implants
- Technical skills in strategic planning and business and market development
- Strong customer orientation

DocuSign Envelope ID: B4F1955D-931C-472D-A51D-31038BC52CEA

- Team Oriented and a desire to build consensus
- Strong verbal and written and presentation communication skills.
- Excellent planning and organizational, project management and time management skills.
- Ability to work on extremely complex problems where analysis of situations or data requires an evaluation of tangible and intangible factors.
- A track record of success that demonstrates analytical skills and innovation is required.
- Strong negotiation skills, with ability to influence and persuade others point of view.
- Demonstrated ability to work in a collaborative effort and get results through others
- Proficient in Microsoft Office suite of products.

## EDUCATION and/or EXPERIENCE

### Education

| Min/Preferred | Education Level | Description |
|---|---|---|
| | | Bachelor's degree in Business Administration, Marketing, or related field or equivalent combination of education and experience is required. |

### Experience

| Minimum Years of Experience | Maximum Years of Experience | Comments |
|---|---|---|
| | | A minimum of 10 years of successful medical device sales management experience with direct involvement in establishing and managing corporate accounts. |

**Other Education and/or Experience**

## CERTIFICATES, LICENSES, REGISTRATIONS

| Certifications, Licenses, Registrations | Comments |
|---|---|
| | Not Applicable |

## PHYSICAL DEMANDS

DocuSign Envelope ID: B4F1955D-931C-472D-A51D-31038BC52CEA

**Physical Demands Disclaimer**

The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

While performing the duties of this job, the employee is regularly required to sit and talk or hear. The employee is occasionally required to stand; walk; use hands to finger, handle, or feel; and reach with hands and arms. The employee must occasionally lift and/or move up to 10 pounds.

## WORK ENVIRONMENT

**Work Environment Disclaimer**

The work environment characteristics described here are representative of those an employee encounters while performing the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

The noise level in the work environment is usually moderate.

## Affirmative Action Statement

**Affirmative Action Statement**

ATEC is committed to providing equal employment opportunities to its employees and applicants without regard to race, color, religion, national origin, age, sex, sexual orientation, gender identity, gender expression, or any other protected status in accordance with all applicable federal, state or local laws. Further, ATEC will make reasonable accommodations that are necessary to comply with disability discrimination laws.

## Disclaimer

*"The above statements are not intended to be an exhaustive list of all responsibilities, duties and skills required of personnel so classified. Nothing in the job description restricts the company's right to change, assign, or reassign duties and responsibilities at any time for any reason."*

**Please Note:**

My signature below certifies that I have received a copy of this job description and I am able to perform the essential functions of the position, with or without reasonable accommodation.

DocuSign Envelope ID: B4F1955D-931C-472D-A51D-31038BC52CEA

**Signature:**

**Date:** 5/24/2022