# EXHIBIT B

## STATE OF MICHIGAN
## KALAMAZOO COUNTY CIRCUIT COURT

---

| | |
|---|---|
| STRYKER EMPLOYMENT COMPANY, LLC, a Michigan limited liability company; and HOWMEDICA OSTEONICS CORP., a New Jersey corporation and subsidiary of STRYKER CORPORATION, a Michigan corporation | Case No.  22-_____ -CB<br><br>Honorable |
|      Plaintiffs,<br><br>v<br><br>JAFAR ABBAS, an individual,<br><br>     Defendant. | **MOTION FOR *EX PARTE* TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND BRIEF IN SUPPORT** |

---

Andrea J. Bernard (P49209)
Jarrod H. Trombley (P83517)
Warner Norcross + Judd LLP
150 Ottawa Ave, Suite 1500
Grand Rapids, MI 49503
616.752.2000
*Attorneys for Plaintiffs*

---

Plaintiffs Stryker Employment Company, LLC and Howmedica Osteonics Corp., a subsidiary of Stryker Corporation, acting through its Spine Division (collectively, "Stryker Spine"), move this Court, pursuant to MCR 3.310, for a Temporary Restraining Order ("TRO") and thereafter a Preliminary Injunction in the form attached as **Attachment A**. This Motion is supported by the accompanying Brief in Support and the Verified Complaint filed in this matter.

### INTRODUCTION

Jafar Abbas ("Abbas") is a former Sales Operations Manager for Stryker Spine.  Bridging the worlds of sales and finance for nearly nine years, Abbas gained deep knowledge of Stryker Spine's most sensitive financial and business information and developed deep and meaningful relationships with Stryker Spine's sales representatives, distributors, and customers alike.  This experience left Abbas uniquely situated to understand and exploit all aspects of Stryker Spine's sales operations, finances,

products, and sales personnel to enhance Stryker Spine's strategy in the highly competitive Spine market. Yet, on May 20, 2022, Abbas resigned his position with Stryker Spine to take a new job as the Director of Strategy for Alphatec Spine, Inc. ("Alphatec"), a direct competitor of Stryker Spine that has systematically engaged in nationwide efforts to raid Stryker Spine's sales operations to gain access to Stryker Spine's Confidential Information, trade secrets, customer goodwill, and talent. Abbas is just Alphatec's most recent target.

Abbas accepted employment at Alphatec despite the fact that, since beginning his employment at Stryker Spine, Abbas agreed he would not work for any competitor, such as Alphatec, for a 12-month period after terminating his employment with Stryker Spine, an obligation that he reiterated on April 4, 2022, when he executed an updated Stryker Corporation Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement for U.S. Employees (the "Noncompete Agreement") in exchange for a stock option and restricted stock units award for Stryker Corporation. (Ver. Compl. Ex A; Ver. Compl. ¶¶ 4, 14.) Furthermore, Abbas stands poised to use and disclose significant amounts of Stryker Spine's Confidential Information[1] and trade secrets in his new role at Alphatec, a violation of both the Noncompete Agreement and the Michigan Uniform Trade Secrets Act ("MUTSA"), MCL 445.1901 *et seq.* Therefore, Stryker Spine respectfully requests that this Court enter the TRO attached as Attachment A, and thereafter a preliminary and permanent injunction.

## BACKGROUND

### Stryker Spine's Business and Alphatec's Corporate Raiding

Stryker Spine is a global leader in the development, manufacture and sale of spinal implants, instruments, and related products and services, which make spinal surgeries and recoveries simpler,

---

[1] The definition of Confidential Information, as used in this Motion, is pulled from Section 2.2 of the Noncompete Agreement which is cited below. (Ver. Compl. Ex A.)

faster, and more effective. (Ver. Compl. ¶ 10.) Stryker Spine products have broad appeal and acceptance in the marketplace and within the spinal surgery community. (*Id.* ¶ 12.) The spinal surgery industry in which Stryker Spine operates is highly competitive.  (*Id.* ¶¶  37, 51.)

Like Stryker Spine, Alphatec provides spinal implants and related products and services and, therefore, directly competes with Stryker Spine. (*Id.* ¶¶ 37, 51.) In fact, Alphatec and Stryker Spine regularly compete to place implants in the same hospitals – often where Stryker Spine has placed, or is negotiating to place, capital equipment which aids in the sale of implants, a sales strategy that Abbas is deeply familiar with through the ACES and other programs at Stryker Spine. (*Id.* ¶ 52.)

Since at least 2018, Alphatec has employed a strategy to systematically and unlawfully misappropriate Stryker Spine's Confidential Information, trade secrets, customer goodwill, and talent by raiding Stryker Spine's key sales personnel and tortiously interfering with Stryker Spine's third-party business relationships.  (*Id.* ¶ 38.) Indeed, Pat Miles, Alphatec's CEO has publicly stated that it is his intent to rely upon the "Stryker prowess from a sales force know-how standpoint" in order to build Alphatec's business. (*Id.* ¶ 39.) Alphatec leadership has also touted that 9 of its 11 senior sales leaders, who are responsible for recruiting sales representatives across the country, came to Alphatec from Stryker Spine and are the baseline ingredient of Alphatec's so-called "Disciplined Approach to Service." (*Id.* ¶ 40.)

Alphatec's solicitation of Stryker Spine's sales force poses harm that goes far beyond monetary losses. (*Id.* ¶ 42.) Stryker Spine's former sales representatives have maliciously exploited Stryker Spine's confidential and proprietary information to compete unfairly against Stryker Spine on behalf of Alphatec. (*Id.*) Armed with this information, Alphatec has had an unfair advantage in targeting Stryker Spine's customers and employees, and has acquired a valuable roadmap for designing and improving its own products, customer relationships, and goodwill. (*Id.*)  Essentially, Alphatec seeks to misappropriate

3

decades of Stryker Spine's client development and customer service techniques in order to unfairly shortcut its own success at Stryker Spine's expense. (*Id.*)

To defend against these unlawful practices, protect its trade secrets and enforce its contractual relationships, Stryker Spine is currently engaged in litigation with Alphatec and others related to Alphatec's unlawful activities, including a lawsuit pending in the United States District Court for the Middle District of Florida, *Howmedica Osteonics Corp. v. Alphatec Spine, Inc.* (3:21-cv-00789), and two others in the United States District Court for the District of New Jersey: *Howmedica Osteonics Corp. v. Howard et al.* (2:19-cv-19254) and *Howmedica Osteonics Corp. v. Lewers et al.* (2:20-cv-14310) (collectively, the "Alphatec Litigation Matters"). (Ver. Compl.  ¶ 43.)

**Stryker Spine Hires Abbas**

Abbas began working for Stryker Spine on July 15, 2013, as a Associate Manager of Finance. (*Id.* ¶ 13.) As a condition of his employment, Abbas was required to, and did, execute a Stryker Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement, which had terms substantially similar to the Noncompete Agreement. (*Id.* ¶ 14.) During his employment with Stryker Spine, Abbas received numerous promotions, pay increases, increases in responsibility, and increased access to Stryker Spine's Confidential Information and trade secrets. (*Id.* ¶ 15.) Most recently on January 1, 2021, Stryker Spine transitioned Abbas to Sales Operations Manager. (*Id.* ¶ 16.) In that role, Abbas' duties included leading various projects and tasks associated with customer sales and financing; developing calculation and reporting tools; building trusted relationships inside and outside Stryker Spine with customers, distributors and sales representatives; influencing decisions with customers; driving urgency on critical priorities; having an advanced understanding of spine business and its competition; and working with the sales and marketing leadership teams to identify domestic sales issues and analyze and communicate recommendations for strategic improvements throughout the U.S.

based on customer, geography, sales representatives, surgeons, and/or products, when applicable. (*Id.* ¶ 17.)

On April 4, 2022, as part of his continued employment with Stryker Spine, Abbas executed the updated Noncompete Agreement. (*Id.* ¶¶ 4, 14.) Section 5.1 of the Noncompete Agreement states:

> I recognize that Confidential Information[2] is of great value to Stryker, that Stryker has legitimate business interests in protecting its Confidential Information, and that the disclosure to anyone not authorized to receive such information, including any entity that competes with Stryker, will cause immediate irreparable injury to Stryker. Unless I first secure Stryker's written consent, I will not disclose, use, disseminate, identify by topic or subject, lecture upon or publish Confidential Information. [...] [(Ver. Compl. Ex A.)]

In order to protect this Confidential Information and prevent third parties and former employees from exploiting Stryker Spine's trade secrets and goodwill, Section 6.3(a) of the Noncompete Agreement also provides, in relevant part:

> During my employment with Stryker and during the Restricted Period,[3] I will not work (as an employee, consultant, contractor, agent, or otherwise) for, or render services directly or indirectly to, any Conflicting Organization[4] in which the services I may

---

2 "'Confidential Information' means know-how, trade secrets, and technical, business and financial information and any other non-public information in any way learned by me, disclosed to me or developed by me during my employment with Stryker, including, but not limited to (a) prices, renewal dates and other detailed terms of customer or supplier contracts and proposals; (b) information concerning Stryker's customers, clients, referral sources and vendors, and potential customers, clients, referral sources and vendors, including, but not limited to, names of these entities or their employees or representatives, preferences, needs or requirements, purchasing or sales histories, or other customer or client-specific information; (c) supplier and distributor lists; (d) pricing policies, methods of delivering services and products, and marketing and sales plans or strategies; (e) products, product know-how, product technology and product development strategies and plans; (f) employees, personnel or payroll records or information; (g) forecasts, budgets and other non-public financial information; (h) acquisitions, divestitures, expansion plans, management policies and other business strategies; (i) inventions, research, development, manufacturing, purchasing, finance processes, technologies, machines, computer software, computer hardware, automated systems, methods, engineering, marketing, merchandising, and selling; and (j) information belonging to third parties which has been disclosed to Stryker in confidence. Confidential Information shall not include information that is or becomes part of the public domain, such that it is readily available to the public, through no fault of mine." (Ver. Compl. Ex A, § 2.2.)

3 "'Restricted Period' means the twelve-month period following termination of my employment with Stryker, regardless of the reason for termination." (Ver. Compl. Ex A, § 2.8.)

4 "'Conflicting Organization' means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a Conflicting Product or Service[.]" (Ver. Compl. Ex A, § 2.4.)

provide could enhance the use or marketability of a Conflicting Product or Service[5] by application of Confidential Information which I have had access to during my employment or while working for a Stryker agency. [...] If I accept employment with a Conflicting Organization, I will provide Stryker written assurances satisfactory to Stryker that indicate that I will not render services directly or indirectly, during the Restricted Period, in connection with any Conflicting Product or Service. I understand that Stryker may also require written assurances from the Conflicting Organization. I also agree that during my employment with Stryker and during the Restricted Period, I will not render services to any organization or person in a position similar in responsibilities to any position I held with Stryker during the twenty-four (24) months prior to the termination of my employment with Stryker for any reason or in any position in which I could use Confidential Information to the detriment of Stryker. [(Ver. Compl. Ex A.)]

And, finally, Section 6.4 of the Noncompete Agreement provides:

I agree that during my employment with Stryker and during the Restricted Period, I will not, directly or indirectly, solicit, induce or influence, or attempt to solicit, induce or influence, any person engaged as an employee, independent contractor or agent of Stryker to terminate his, her or its employment and/or business relationship with Stryker or do any act which may result in the impairment of the relationship between Stryker and its employees, independent contractors or agents. [(Ver. Compl. Ex A.)]

**Abbas' Access to Stryker Spine's Confidential Information and Trade Secrets**

While working for Stryker Spine, Abbas had access to and made use of significant amounts of Stryker Spine's Confidential Information and trade secrets. (*Id.* ¶ 18.) For example, Abbas was responsible for cross-divisional collaboration between Stryker Spine's Enabling Technology and Implant business units, coordinating the work of the finance and sales departments as it related to the placement of navigation systems and instruments and implant commitments with customers via the highly successful Acquiring Capital Equipment ("ACES") program. (*Id.* ¶ 19.) Abbas was often a key player in closing ACES deals with Stryker Spine customers.  (*Id.*) Through the ACES program, Abbas gained deep familiarity with customer needs and with the costs, benefits, sales margins, and profits for Stryker

---

5 "'Conflicting Product or Service' means any product, process, technology, machine, invention or service of any person or organization other than Stryker in existence or under development which is similar to, resembles, competes with or is intended to resemble or compete with a product, process, technology, machine, invention or service upon which I have worked or about which I was knowledgeable during the last twenty-four (24) months of my employment with Stryker or while providing products or services to a Stryker customer[.]" (Ver. Compl. Ex A, § 2.3.)

Spine's products associated with the ACES program specifically, and Stryker Spine's business strategy at large. (*Id.*)

Abbas was also a key player in Stryker Spine's upgrade strategy, a breakoff of the ACES program, working with customers in often multi-million-dollar deals to upgrade instrument and machine placements. (*Id.* ¶ 20.) While working on the ACES, upgrade, and other programs for Stryker Spine, Abbas would regularly present, sell, and negotiate unique financing options with customers and, in the course of such discussions, made regular contacts with C-suite officers and other decision-makers at Stryker Spine's customers. (*Id.* ¶ 21.)

As the Sales Operations Manager and in prior roles, Abbas regularly participated on a weekly team call with Enabling Technology's VP of Sales and the regional sales managers for Stryker Spine and thereby learned detailed information regarding Stryker Spine's nationwide sales and marketing strategies, customer targets, and sales goals. (*Id.* ¶ 22.) In fact, Abbas requested to be allowed on this call on his last day of employment, even knowing that he would come into contact with this deeply sensitive information – though his request was swiftly rejected given its suspicious nature. (*Id.* ¶ 50.) Abbas also was introduced to and worked with all of Stryker Spine's sales representatives throughout the United States. (*Id.* ¶ 22.) Because of his reporting duties as the Manager of Sales Operations, Abbas also had particularized knowledge of Stryker Spine's sales compensation structure and commissions plans. (*Id.* ¶ 23.)

Given his extensive knowledge of Stryker Spine's sales and financial operations, Abbas was called upon and personally assisted Stryker Spine's legal team with compiling reports and information related to Stryker Spine's litigation strategy and damages in the Alphatec Litigation Matters including, without limitation, working with counsel to compile financial and sales information associated with certain surgeons throughout the United States. (*Id.* ¶ 44.) Therefore, Abbas learned of key components

of litigation strategies and positions relevant to ongoing disputes between Stryker Spine and his new employer Alphatec and others in the aforementioned Alphatec Litigation Matters, all of which constitute Confidential Information and trade secrets. (*Id.*)

From May 16, 2022 to May 19, 2022, just days before his resignation, and well after he knew he would be leaving Stryker Spine, Abbas attended a regional sales meeting and training for Q Guidance, a navigation system that Stryker Spine will soon be launching ("Q Guidance Meeting").  (*Id.* ¶ 24.) At this meeting, Stryker Spine provided training on product nuances associated with Q Guidance that are not known to the public. (*Id.*) Stryker Spine also internally unveiled a confidential product in the initial stages of development. (*Id.*) During this meeting, Abbas led training with the Strategic Sales team focusing on ACES best practices and the use of Sales Force for pricing, quoting, and to find business prospects. (*Id.* ¶ 25.) He also discussed confidential strategy with Stryker Spine Sales representatives regarding how to outmaneuver and beat Stryker Spine's competitors – including Alphatec. (*Id.*)

Abbas was also responsible for generating numerous reports at Stryker Spine, including without limitation, ACES reporting, product price/volume/mix reporting, and outstanding auto-replenishment orders reporting, and he thus became familiar with the economic and inventory positions of Stryker Spine and its customers. (*Id.* ¶ 26.) Abbas had full access to and regularly utilized PowerBI, the sales management platform and database where all Stryker Spine customer sales information, forecasting, quotas, and commission structures were managed and stored. (*Id.* ¶ 27.)

None of these pieces of Confidential Information or trade secrets learned by Abbas are known outside of Stryker Spine and all of them are extremely valuable to Stryker Spine in maintaining a competitive edge. (*Id.* ¶ 34, 35.) Stryker Spine has also taken numerous steps to safeguard the Confidential Information and trade secrets in Abbas' possession and its other Confidential Information and trade secrets. (*Id.* ¶ 36.) For example, Stryker Spine has its employees and other agents execute

confidentiality and noncompete agreements, such as the Noncompete Agreement. (*Id.*) Stryker Spine has employed password protection on its computers and other electronic devices. (*Id.*) Stryker Spine has also initiated numerous lawsuits, including the Alphatec Litigation Matters and this case, to enforce its confidentiality and noncompete agreements and to stop outsiders from accessing Stryker Spine's Confidential Information and trade secrets. (*Id.*)

**Abbas' Separation from Stryker Spine and Acceptance of Employment with Alphatec**

In the summer of 2021, as part of its nationwide scheme to raid Stryker Spine, Alphatec attempted to recruit Abbas away, though it appears this initial attempt was unsuccessful.  (*Id.* ¶ 45.) However, on May 20, 2022, Abbas resigned from Stryker Spine and told his supervisor that he was leaving to take a position with Alphatec. (*Id.*) This was consistent with Abbas' statements in his exit interview, in which he reported to Stryker's Human Resources department that he was leaving to accept a position as Alphatec's Director of Strategy. (*Id.* ¶ 46.)

Abbas told his supervisor that, in his new role, he would be reporting to Alphatec's Vice President of Sales, David Sponsel – another former Stryker Spine employee. (*Id.* ¶ 47.) Abbas also told his Stryker supervisor that in his Director of Strategy position for Alphatec he would be responsible for understanding Alphatec's sales landscape, for setting the direction of sales goals, and that a portion of his compensation at Alphatec would be tied to successful sales results in the United States. (*Id.* ¶ 48.)

On May 24, 2022, Stryker Spine emailed Abbas a letter reminding him of his obligations under the Noncompete Agreement. (*Id.* ¶ 60; Ver. Compl. Ex B.) Pursuant to section 6.5 of the Noncompete Agreement, Stryker Spine also asked Abbas to report on his title and job duties. (*Id.*)  On May 27, 2022, Stryker Spine emailed Abbas a second time, attaching the May 24, 2022 letter and his Noncompete Agreement, reiterated its demand that Abbas provide a written description of his position and job duties at Alphatec, and demanded that Abbas not begin working at Alphatec while it investigates this matter further.  (*Id.*; Ver. Compl. Ex C**.**) Instead of responding himself, Alphatec's Legal Affairs & Litigation

Director responded on Abbas' behalf and attached a summary of Abbas' Alphatec duties and responsibilities. (Ver. Compl. ¶¶ 61, 62; Ver. Compl. Ex D.)   Rather than assuage Stryker Spine's concerns, the May 31, 2022 job description deepened them. (Ver. Compl. ¶ 63.) Abbas' new job description – as further stated in the Verified Complaint –   makes clear that he will be performing essentially the same duties for Alphatec that he previously performed for Stryker Spine, including developing sales strategy and customer relationships, developing sales force compensation and commission plans, and developing customer financing relationships and strategies. (*Id.*; Ver. Compl. Ex D.)

Also concerning is that, upon information and belief, Abbas is influencing and/or will influence other employees, independent contractors, and/or agents of Stryker Spine, either directly or indirectly, to leave Stryker Spine to join Alphatec. (*Id.* ¶ 65.) When leaving Stryker Spine, Abbas called numerous other employees and agents of Stryker Spine, including sales representatives, to inform them of his intent to join Alphatec. (*Id.*)

**ARGUMENT**

**I.    STRYKER SPINE SATISFIES THE REQUIREMENTS FOR INJUNCTIVE RELIEF**

Circuit courts are equitable courts with the power to issue injunctive relief.   *Universal Am-Can v Attorney General*, 197 Mich App 34, 37; 494 NW2d 787 (1992).   Under the Court's equitable powers, Stryker Spine seeks a TRO pursuant to MCR 3.310(A), which this Court has the power to issue at its discretion.   *See, e.g., Attorney General v Thomas Solvent Co*, 146 Mich App 55, 60-61; 380 NW2d 53 (1985).   In exercising its discretion, this Court must balance four factors:   (1) whether the party seeking the injunction will suffer irreparable injury if the injunction is not issued; (2) whether it is likely that the party seeking the injunction will prevail on the merits; (3) whether the party seeking the injunction will be harmed more if the injunction does not issue than the opposing party will be harmed if an injunction is granted; and (4) whether the issuance of the injunction will promote the public's interest.   *Thermatool*

*Corp v Borzym*, 227 Mich App 366, 376; 575 NW2d 334 (1998); *Michigan State Employees Ass'n v Department of Mental Health*, 421 Mich 152, 157-158; 365 NW2d 93 (1984); *Campau v McMath*, 185 Mich App 724, 728-729; 463 NW2d 186 (1990).  Each of these factors favors Stryker Spine.

       **A.**      **Stryker Spine will suffer irreparable injury without injunctive relief.**

Without securing a TRO and subsequent injunctive relief, Stryker Spine will suffer irreparable injury, or an actual "noncompensible injury for which there is no legal measurement of damages or for which damages cannot be determined with a sufficient degree of certainty." *Thermatool,* 227 Mich App at 338-339.  Michigan courts have repeatedly found that relationships formed between the representatives of a business and its customers are protectable business interests, and equitable relief is appropriate to preserve a business's goodwill with its customers.  *See St Clair Medical, PC v Borgiel*, 270 Mich App 260, 268-69; 715 NW2d 914 (2006) (loss of customer goodwill supports a finding of irreparable harm); *Superior Consulting Co, Inc v Walling,* 851 F Supp 839 (ED Mich 1994) (same). Similarly, Michigan courts hold that the use or disclosure of confidential information causes irreparable harm to the owner of the confidential information. See, e.g., *Kelly Services, Inc v Noretto*, 495 F Supp 2d 645, 659 (ED Mich, 2007); *Stryker Corp v Bruty*, No. 1:13-CV-288, 2013 WL 1962391, at *7 (WD Mich May 10, 2013) ("the unauthorized use — actual or threatened—of confidential information constitutes irreparable harm sufficient for issuance of an injunction.") Finally, a disclosure of privileged information is also considered irreparable. *In re Perrigo Co*, 128 F3d 430, 437 (CA 6, 1997) ("We find, as have several courts, that forced disclosure of privileged material may bring about irreparable harm.").

If Abbas begins or continues working at Alphatec or any other competitor, Stryker Spine would experience immediate and irreparable injury, including damage to its customer relationships and loss of its Confidential Information and trade secrets. As stated above, Abbas worked closely with Stryker Spine's sales representatives across the United States as well as directly with key customer decision-makers in the spinal implant industry. In his new Director of Strategy role where he will be reporting

directly to the Alphatec Vice President of Sales, Abbas can and undoubtedly will be asked to assist Alphatec in attacking these targets. Damages here would be especially difficult to calculate as, unlike sales representatives, Abbas worked with customers and representatives across the United States, rather than in a limited territory.

Relatedly, Stryker Spine is also at immediate risk that Abbas will use or disclose Stryker Spine's Confidential Information and trade secrets, of which he gained deep familiarly, for the benefit of Alphatec. Once this information is in Alphatec's hands, the damage is done, and Stryker Spine will never be able to wind back the clock. These are the types of harms that are intended to be remedied by injunctive relief because damages at law cannot compensate for them.  *See e.g. Basicomputer Corp v Scott*, 973 F2d 507, 511-12 (CA 6, 1992) (loss of customer goodwill is irreparable as a matter of law because it is difficult, if not impossible, to determine the resulting damages); *RGIS, LLC v Gerdes*, 817 Fed Appx 158, 163 (CA 6, 2020) (disclosure of trade secrets results in irreparable harm). In fact, Abbas specifically agreed that Stryker Spine "will suffer irreparable injury, loss, harm and damage if [Abbas] engage[s] in conduct prohibited in the Noncompete Agreement[.]" (Ver. Compl. Ex A, § 7.6.)

On the issue of Abbas' possession of privileged information and knowledge of work product and litigation strategy, it is indisputable that if these were disclosed to counsel or the defendants in the Alphatec Litigation Matters, it could cause significant harm that would be nearly impossible to calculate. *See, e.g. FCA US LLC v Bullock*, No. 17-CV-13972, 2018 WL 1064536, at *3 (ED Mich, February 26, 2018) ("if Bullock does in fact have confidential information from FCA that she subsequently uses against it in litigation, damages flowing from such harm would be difficult to quantify and would constitute irreparable harm.") (**Attachment B**.) Therefore, Abbas should not be permitted to have written or verbal *ex parte* communications with any attorneys who represent Alphatec or any other defendants in the Alphatec Litigation Matters and should otherwise be prohibited from disclosing any privileged or

strategic information related to Stryker Spine or its litigation strategies in those matters. Moreover, given that Stryker Spine has never waived this privilege, ethical rules would prevent opposing counsel in the Alphatec Litigation Matters from invading this privilege through Abbas. *See, e.g.*, MRPC 4.4 ("In representing a client, a lawyer shall not... *use methods of obtaining evidence that violate the legal rights of [a third] person*." (emphasis added.))

A damages award will not, and cannot, fully remedy any of the foregoing injuries. Therefore, without the attached TRO, Stryker Spine will suffer immediate and irreparable injury.

**B.     Stryker Spine is likely to succeed on the merits**

Stryker Spine is likely to succeed on each portion of its complaint that is relevant to this Motion.

1.     *Violation of the Noncompete Agreement*

To succeed on a claim for breach of contract, a plaintiff must prove "(1) there was a contract, (2) the other party breached the contract, and (3) the breach resulted in damages to the party claiming breach." *Bank of Am, NA v First Am Title Ins Co*, 499 Mich 74, 100; 878 NW2d 816 (2016). Stryker Spine can establish each of these elements.

First, here, it is indisputable that the Noncompete Agreement is a valid enforceable contract and, further, that Section 6.3 is an appropriate noncompetition provision under MCL 445.774a(1) because it protects Stryker Spine's reasonable competitive business interests, including client goodwill, Confidential Information, and trade secrets. *See, e.g.* MCL 445.774a(1) ("An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business."); *Rooyakker & Sitz, PLLC v Plante & Moran, PLLC*, 276 Mich App 146, 158; 742 NW2d 409 (2007) ("preventing the anticompetitive use of confidential information is a legitimate business interest" (internal citations omitted)); *A Complete Home*

*Care Agency, Inc v Gutierrez*, unpublished opinion of the Court of Appeals, issued June, 29, 2004 (Docket No. 246280), 2004 WL 1459450, p *5 ("The legitimate business interest is the retaining of clients and goodwill."). (**Attachment C**.)

The Noncompete Agreement is limited in duration in that it lasts only one year. *Lowry Comput Prods v Head*, 984 F Supp 1111, 1116 (ED Mich 1997*)* ("As to duration, courts have upheld time periods of six months to three years."). Like the industry at issue in *Lowry*, where the Court upheld a one-year noncompete agreement (*id*), the spinal industry is highly competitive.  The geographic scope is also appropriate because Abbas worked with customers and sales representatives across the entire United States. *ACS Consultant Co, Inc v Williams*, No. 06-11301, 2006 WL 897559, at *7 (ED Mich, April 6, 2006) (nationwide scope of noncompete was reasonable where plaintiff's consulting business had clients in 48 states and serviced clients in all 50 states); *Owens v Hatler*, 373 Mich 289, 293; 129 NW2d 404 (1964) ("[T]he restraint may be as broad as the business covered by the agreement and of sufficient scope to prevent competition therewith."). Finally, the line of business subject to the Noncompete Agreement is also narrowly tailored as Abbas is only prohibited from working for "any Conflicting Organization in which the services [Abbas] may provide could enhance the use or marketability of a Conflicting Product or Service by application of Confidential Information" that Abbas had access to during his employment with Stryker Spine.  (Ver. Compl. Ex A., § 6.39(a).)

Second, Stryker will have no issue showing Abbas' numerous breaches of the Noncompete Agreement. Beginning with Section 6.3, it cannot be disputed that Alphatec, which is focused on the sale and service of spinal implant technologies, is a Conflicting Organization that offers Conflicting Products and Services. Abbas was a key player in the sale of those technologies, working with sales representatives and customers alike to develop financing options and sell implants, capital equipment, and upgrades. At Alphatec, where Abbas will be the Director of Strategy focusing on sales direction, compensated in part

on the success of US sales, and reporting to the Vice President of Sales, it indisputable that Stryker Spine's Confidential Information and trade secrets will inevitably be used to enhance Alphatec's market position. In particular, Alphatec would materially benefit by knowing Stryker Spine's pricing, customer targets, customer contacts, and product mix and volume – all information that Abbas possesses because of his work for Stryker Spine. Further, given that Alphatec's main strategy has been converting Stryker Spine's business by unlawfully soliciting its sales representatives, Alphatec could benefit from knowing who those representatives are, their successes, and their current compensation – all of which is known to Abbas. In fact, as can be seen from the May 31, 2022 job description, Abbas will be performing essentially the same duties for Alphatec as he was for Stryker Spine. Therefore, since Abbas has accepted employment at Alphatec within one year of leaving Stryker Spine, he is undoubtedly in violation of Section 6.3 of the Noncompete Agreement.

Next, since Abbas is bringing significant amounts of Stryker Spine Confidential Information and trade secrets to his sales role at Alphatec, it is inevitable that, if Abbas has not already used or disclosed this information for the benefit of Alphatec, he will do so in the course of his employment. Regardless of intent, he cannot avoid considering this information given the significant degree of overlap in the positions. Therefore, Abbas has breached, or will breach, Section 5.1 of the Noncompete Agreement. In fact, during his last days at Stryker Spine, Abbas seemed intent on gaining critical product and market information that could not possibly have been used to benefit Stryker Spine; he knew full well that he was leaving Stryker Spine within days, yet he attended the product reveals and trainings at the Q Guidance Meeting and sought to attend the weekly sales meeting on his last day at Stryker Spine.

Abbas also called numerous agents and employees of Stryker Spine in his final days to tell them he was joining Alphatec. While this may seem innocuous, this is extremely concerning given Alphatec's raiding of Stryker Spine's employees, which has given rise to numerous lawsuits – including this one

and the Alphatec Litigation Matters. If Abbas is directly or indirectly assisting Alphatec in recruiting Stryker Spine employees, independent contractors, or agent, this would constitute a violation of Section 6.4 of the Noncompete Agreement.

Third, the foregoing will also inevitably give rise to significant damages to Stryker Spine in terms of loss of customer relationships, Confidential Information, trade secrets, and relationships with sales representatives and distributors. For these reasons, Stryker Spine is likely to succeed on the merits of its claims related to breach of the Noncompete Agreement.

2.   *Violations of MUTSA*

Stryker Spine is likely to succeed on its MUTSA claims against Abbas. Michigan law expressly prohibits the actual or threatened misappropriation of trade secrets and grants the Court the authority to enter an injunction to ensure trade secrets are not disclosed. MCL 445.1903. Abbas' imminent employment with Alphatec, his access to Stryker Spine trade secrets, and the acquisition and attempted acquisition of additional trade secrets in the days leading up to his resignation, as well as established Michigan law, support granting Stryker Spine a TRO to prevent it from being irreparably harmed.

A significant amount of the Confidential Information Abbas was provided during his employment with Stryker Spine constitutes protectable trade secrets.  Abbas had access to and made use of highly confidential customer lists, customer needs, customer contacts, past and present negotiations, sales targets, sales strategies, compensation structures of sales representatives, sales representative and distributor contact information, financial data, pricing, sales margins, financing strategies, incentive programs, privileged information, litigation strategies, and product launches. In fact, he also had access to and openly discussed Stryker Spine's competition strategies.

Under Section 5.1 of the Noncompete Agreement, Abbas agreed that this information constituted confidential and protectable information, and further agreed not to use or disclose the information without Stryker Spine's consent. Accordingly, this information constitutes a protectable trade secret under

MUTSA. *See also, e.g.*, *Actuator Specialties, Inc v Chinavare*, unpublished opinion of the Court of Appeals, issued December 1, 2011 (Docket No. 297915), 2011 WL 6004068, p *1–2 (confidential engineering data and financial information was trade secret) (**Attachment D**); *Spartan Graphics, Inc v Entermarket Corp*, unpublished opinion of the Court of Appeals, issued November 16, 2010 (Docket No. 292235), 2010 WL 4628643, p *2 (confidential pricing information and sales strategies were trade secrets) (**Attachment E**); *Elec Planroom, Inc v McGraw-Hill Companies, Inc*, 135 F Supp 2d 805, 819–20 (ED Mich, 2001) (customer identities and needs may constitute trade secret information); *Kelly Servs v Noretto*, 495 F Supp 2d 645, 658–659 (ED Mich 2007) (customer list that includes pricing and profit information, customer contract details, and company marketing plans entitled to trade secret status).

Litigation strategies and privileged information are also clearly trade secrets as they are "information" that derives "economic value" in the civil litigation matters Abbas assisted on, "from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," including the opposing parties and their counsel. MCL 445.1902(d). *See also e.g. Chore-Time Equip, Inc v Big Dutchman, Inc*, 255 F Supp 1020, 1021 (WD Mich, 1966) ("it generally is acknowledged that the attorney-client privilege is so sacred and so compellingly important that the courts must, within their limits, guard it jealously."). Moreover, "[w]hen the client is an organization, the privilege attaches to communications between the attorney and any employee or agent 'authorized to speak on its behalf in relation to the subject matter of the communication.'" *Krug v Ingham Cty Sheriff's Office*, 264 Mich App 475, 485, 691 NW2d 50 (2004). Here, Abbas was specifically asked by Stryker Spine's counsel to prepare, consolidate, and deliver financial information and data in support of Stryker Spine's litigation position. Stryker Spine has not waived its privilege.

Abbas' actions leading up to and following his resignation from Stryker Spine, coupled with his imminent employment with Alphatec, requires the Court to enter the TRO against Abbas to protect Stryker Spine's trade secrets.  As noted above, under the MUTSA, the Court has the authority to enjoin "the actual *or threatened* misappropriation of a trade secret."  MCL 445.1903 (emphasis added).

An injunction is warranted to prevent threatened misappropriation of a trade secret when (1) a valid trade secret exists; (2) the employee at issue has imminent plans to work for a competitor; and (3) the employee demonstrates a "lack of trustworthiness beyond his decision to work for a competitor." *Actuator Specialties*, 2011 WL 6004068 at *3-4 (citing *CMI Intern, Inc v Intermet Intern Corp*, 251 Mich App 125, 133; 649 NW2d 808 (2002)).  As set forth above, a significant amount of Stryker Spine's Confidential Information in Abbas' possession constitutes protectable trade secrets under Michigan law. Additionally, Alphatec is without question a Stryker Spine competitor—a fact reaffirmed by ongoing litigation between the two entities and on which Abbas assisted while employed at Stryker Spine.

Finally, Abbas' activities leading up to and following his employment demonstrate a substantial lack of trustworthiness beyond simply his decision to work for Alphatec. Namely, without disclosing his intentions and despite knowing that he would be leaving Stryker Spine that week – and therefore knowing he would never need the information to benefit Stryker Spine – Abbas attended the Q Guidance Meeting where, among other things, a new undisclosed product was revealed internally, he discussed strategies to overcome competitors such as Alphatec, and inside information on the new Q Guidance Product was disclosed. Abbas also asked to be on the weekly sales call on his last day despite knowing that deeply sensitive client, financial, sales, and target information would be discussed. Equally suspicious is Abbas' decision to call sales representatives throughout Stryker Spine to let them know he was joining Alphatec despite knowing of his prospective employer's corporate raiding.

For these reasons, Stryker Spine is likely to succeed on its MUTSA claim.

**C.      Both the balance of harms and the public interest weigh in favor of injunctive relief**

Injunctive relief preventing Abbas from unfairly competing with Stryker Spine and otherwise violating the Noncompete Agreement and MUTSA will do nothing more than prevent Abbas from doing what he promised not to do in the first place and, indeed, what he is legally prohibited from doing. Similarly, prohibiting Abbas from having *ex parte* communications with any attorneys who represent Alphatec or any other defendants in the Alphatec Litigation Matters or otherwise disclosing any privileged or strategic information related to Stryker Spine or its litigation strategies in those matters, will do nothing more than prohibit Abbas from something he is also already prohibited by law from doing and which lawyers are prohibited from inquiring about under MRPC 4.4. Stryker Spine, on the other hand, will be irreparably harmed by loss of customer goodwill and the use and disclosure of its Confidential Information, trade secrets, and privileged information. Granting a TRO and preliminary injunction will merely return Stryker Spine and Abbas to the equitable positions they held prior to Abbas' actual and threatened violations and will prevent further violations of the Noncompete Agreement, MUTSA, and disclosure of privileged information. Therefore, the balance of harms weighs heavily in Stryker Spine's favor.

Additionally, as a matter of statutory and public policy, the legislature has declared that reasonable non-competition and confidentiality agreements such as the Noncompete Agreement are enforceable and consistent with the public interest. See MCL 445.774a. The legislature has similarly protected against the unauthorized disclosure of trade secrets and confidential information. See MCL 445.1901 et seq. In particular, MCL 445.1903 specifically empowers courts to enjoin actual or threatened misappropriation of trade secrets. And that Michigan courts favor the protection of attorney-client privilege is axiomatic and extends far back into the state's history. *See, e.g. Hamilton v People*, 29 Mich

173, 184 (1874) ("We concur fully in the broad and sensible doctrine laid down by *Lord Selborne* in *Minet v. Morgan,* L. R., 8 Ch. Ap., 361, that neither client nor attorney can be compelled to answer and disclose matters of confidence."); *Chore-Time*, 255 F Supp at 1021 ("it generally is acknowledged that the attorney-client privilege is so sacred and so compellingly important that the courts must, within their limits, guard it jealously.").

Thus, all factors considered in awarding injunctive relief weigh in favor of awarding Stryker Spine the TRO requested here.

## CONCLUSION

Pursuant to the argument set forth above, Stryker Spine respectfully requests that this Court enter the TRO attached as **Attachment A**, and thereafter a preliminary and permanent injunction.

Dated:  June 1, 2022                                         Warner Norcross + Judd LLP

/s/ Jarrod H. Trombley
Andrea J. Bernard (P49209)
Jarrod H. Trombley (P83517)
*Attorneys for Plaintiff*

**ATTACHMENT A**

**STATE OF MICHIGAN**
**KALAMAZOO COUNTY CIRCUIT COURT**

_____

STRYKER EMPLOYMENT COMPANY,                     Case No. 22-_____ -CB
LLC, a Michigan limited liability company; and
HOWMEDICA OSTEONICS CORP., a New                Honorable
Jersey corporation and subsidiary of STRYKER
CORPORATION, a Michigan corporation

Plaintiffs,
v

JAFAR ABBAS, an individual,

            Defendant.

_____

Andrea J. Bernard (P49209)
Jarrod H. Trombley (P83517)
Warner Norcross + Judd LLP
150 Ottawa Ave, Suite 1500
Grand Rapids, MI 49503
616.752.2000
Attorneys for Plaintiffs

_____

**TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE**

_____

At a session of said Court, held in the City of Kalamazoo,
County of Kalamazoo, State of Michigan, this
_____ day of _____, 2022

PRESENT HONORABLE _____
                                    Circuit Court Judge

This Court has read the Verified Complaint and the Motion for Temporary Restraining

Order and Brief in Support. Based on the foregoing, it appears that Plaintiffs do not have an

adequate remedy at law and that the actions of Defendant will cause immediate and irreparable

injury to Plaintiffs by injuring Plaintiffs' goodwill with customers, by using and/or disclosing

Plaintiffs' confidential information, and by using and/or disclosing Plaintiffs' privileged

information and litigation strategies. It is recognized that this Order is entered without notice to

prevent immediate and irreparable harm which would result from the delay required to affect such notice.  Therefore,

IT IS HEREBY ORDERED AND ADJUDGED AS FOLLOWS:

A. This Order will expire, absent modification or extension by this Court or stipulation of the Parties, fourteen (14) days from the date this Order is entered;

B. Defendant is prohibited from working (as an employee, consultant, contractor, agent, or otherwise) for, or rendering services directly or indirectly to, Alphatec Spine Inc. or any of its parents, subsidiaries, or affiliates ("Alphatec") or any other Conflicting Organization as the term is defined and used in Sections 2.4 and 6.3 of the Stryker Corporation Confidentiality, Intellectual Property, Non-Competition and Non-Solicitation Agreement for U.S. Employees Dated April 4, 2022 ("Noncompete Agreement") among the Parties;

C. Defendant is prohibited from disclosing, using, disseminating, identifying by topic or subject, lecturing upon or publishing any Confidential Information, as the term is defined and used in Sections 2.2. and 5.1 of the Noncompete Agreement;

D. Defendant is prohibited from directly or indirectly, soliciting or influencing, or attempt to solicit, induce or influence, any person engaged as an employee, independent contractor or agent of Stryker, as the term is defined and used in the Noncompete Agreement, to terminate his, her or its employment and/or business relationship with Stryker or do any act which may result in the impairment of the relationship between Stryker and its employees, independent contractors or agents;

E. Defendant is ordered to deliver all Confidential Information, as the term is used and defined in the Noncompete Agreement, in Defendant's possession to Plaintiffs including all such information stored electronically;

F.  Defendant is prohibited from having any *ex parte* communications, written or verbal, with any attorneys who represent Alphatec or any other defendants in the lawsuits in the United States District Court for the District of New Jersey titled *Howmedica Osteonics Corp. v. Howard et al.* (2:19-cv-19254) and *Howmedica Osteonics Corp. v. Lewers et al.* (2:20-cv-14310), and/or the lawsuit filed in the United States District Court for the Middle District of Florida  titled *Howmedica Osteonics Corp. v. Alphatec Spine, Inc.* (3:21-cv-00789), or otherwise disclosing any privileged or strategic information related to Stryker Spine or its litigation strategies in those matters.

G.  Plaintiffs and Defendant are ordered to participate in expedited discovery during the period prior to the hearing on the Order to Show Cause, including depositions and subpoenas duces tecum; and

H.  Defendant shall appear before this Court on _____, 2022, at _____, or as soon thereafter as counsel may be heard, and show cause, if any there be, why a preliminary injunction in the manner described above shall not issue.

**THIS ORDER DOES NOT RESOLVE THE LAST PENDING CLAIM AND DOES NOT CLOSE THIS CASE.**

IT IS SO ORDERED.

_____

Hon. _____
            Circuit Court Judge

3

**ATTACHMENT B**

2018 WL 1064536
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

FCA US LLC, Plaintiff,

v.

Patrea BULLOCK, Defendant.

Case No. 17-cv-13972
|
Signed 02/26/2018

**Attorneys and Law Firms**

Bethany G. Stawasz, John E. Berg, Anthony A. Agosta, Clark Hill, PLC, Detroit, MI, for Plaintiff.

Patrea R. Bullock, Roseville, CA, pro se.

### OPINION & ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER (Dkt. 2)

MARK A. GOLDSMITH, United States District Judge

**\*1** This matter is before the Court on Plaintiff FCA US LLC's ("FCA") motion for a temporary restraining order (Dkt. 2). The motion has been fully briefed—including several supplemental filings from both parties—and a hearing was held on January 5, 2018. For the reasons that follow, the Court denies the motion.

### I. BACKGROUND

Defendant Patrea Bullock is an attorney who previously worked for two law firms in California, Universal & Shannon, LLP ("U&S") (August 2016–May 2017) and Gates, O'Doherty, Gonter & Guy LLP ("GOGG") (June 2017–October 2017). Compl. ¶¶ 8, 20 (Dkt. 1). FCA was a client of both U&S and GOGG, and during Bullock's time at these law firms, she worked on dozens of breach of warranty cases for FCA. Id. ¶¶ 9, 21. FCA alleges that she "personally determined and advised FCA US about how to respond regarding particular claims, evaluated the defenses available to FCA US, developed overall defense strategy, and engaged in regular contact with FCA US regarding the defenses

and strategies of various cases." Id. ¶ 11. She participated in all aspects of these breach of warranty cases, including depositions, id. ¶¶ 14, 23; drafting responses and objections in discovery, ¶¶ 15, 25; and settlement discussions, ¶¶ 17, 22. In April 2017, Bullock attended a training program conducted by FCA's inside and outside counsel, and signed a confidentiality agreement (the "Confidentiality Agreement") regarding certain client confidential information learned about FCA. Id. ¶ 19; Def. Supp. Br. at 3 (Dkt. 29); see also Confidentiality Agreement, Ex. A to Pl. Reply (Dkt. 17-2). Bullock was privy to "privileged, confidential, and/or sensitive information." Id. ¶ 15.

Bullock stopped working for GOGG in October 2017 and opened her own practice. Id. ¶ 30. She advertised herself as an "expert lemon law attorney serving Northern California." See Website Print-out, Ex. B to Pl. Reply (Dkt. 17-3). Prior to leaving GOGG, Bullock apparently transferred data from her work computer to a USB device, including folders labeled, "Cases," "Helpful Info," "Lemon Law Cases," "My Business," and "Releases." See Declaration of Michael Bandemer ¶ 8f (Dkt. 24).

On November 20, 2017, Bullock filed a California lawsuit against FCA, alleging breach of warranty on behalf of an owner of an FCA-manufactured vehicle, Brown v. FCA US LLC, No. 34-2017-00222086 (Super. Ct. of Cal., Sacramento). Id. ¶ 31. FCA then filed the instant complaint, alleging claims for breach of contract, misappropriation of trade secrets, violation of federal trade secret laws, breach of fiduciary duty, and injunctive relief. Since then, Bullock has filed at least two other breach of warranty lawsuits against FCA in California. See Pl. Supp. Br. (Dkt. 34) (noting Arias v. FCA US, LLC, No. FCS050161 (Super Ct. of Cal., Fairfield)); Pl. Supp. Notice (Dkt. 37) (noting Lewis v. FCA US LLC, No. CV-18-240 (Super. Ct. of Cal., Yolo)).

FCA filed a motion for a temporary restraining order, requesting that the Court enjoin Bullock from filing breach of warranty lawsuits against FCA, destroying any records or documents in her possession which were obtained from FCA which relate to breach of warranty cases, and divulging any of FCA's confidential or proprietary information, among other requests. Pl. Mot. for TRO at 15-16 (Dkt. 2).

### II. ANALYSIS

FCA US LLC v. Bullock, Not Reported in Fed. Supp. (2018)

2018 WL 1064536

Case 1:22-cv-00531-JMB-SJB ECF No. 5-2, PageID.99 Filed 06/13/22 Page 28 of 50

**\*2** To determine whether to grant a preliminary injunction or temporary restraining order, a district court must consider: (i) whether the movant has a strong likelihood of success on the merits; (ii) whether the movant would suffer irreparable injury without the injunction; (iii) whether issuance of the injunction would cause substantial harm to others; and (iv) whether the public interest would be served by the issuance of the injunction. Baker v. Adams Cty./Ohio Valley Sch. Bd., 310 F.3d 927, 928 (6th Cir. 2002). These four factors "are factors to be balanced, not prerequisites that must be met." Hamad v. Woodcrest Condo. Ass'n, 328 F.3d 224, 230 (6th Cir. 2003).

### A. Likelihood of success on the merits

FCA argues that it has shown a strong likelihood of success on the merits, because Bullock has breached her fiduciary duties, misappropriated FCA's trade secrets, breached the Confidentiality Agreement, or will do so in the future. Pl. Mot. at 10. Bullock contends that FCA has failed to show that Bullock has learned any non-public information that could not be gained simply by working opposite FCA's defense attorneys. Def. Resp. to Supp. Br. at 3-4 (Dkt. 33).

The Court finds that FCA has not, at this stage, shown a strong likelihood of success on the merits. FCA claims that Bullock has breached the fiduciary duties owed to FCA by representing the Browns and other plaintiffs. It is true that the law presumes that where former and current representations are substantially related, information learned from the client in the former representation will be used in the later representation. See, e.g., In re Marks & Goergens, Inc., 199 B.R. 922, 925 (E.D. Mich. 1996) (if a substantial relationship exists between an attorney's former and present representations, "a presumption is created that the attorney will use information received from the former client in the ethical obligation to vigorously represent the present client, thus violating the ethical obligations of loyalty and confidence"). However, this presumption only obtains where the representations are substantially related.

FCA points out that Bullock represented FCA in at least two breach of warranty actions involving Dodge Darts, the vehicle at issue in Brown, Pl. Supp. Br. at 4-5 (Dkt. 29); Jeep Grand Cherokees, the vehicle at issue in Arias, Pl. Supp. Br. at 1-2 (Dkt. 34); and at least six cases involving a Chrysler 200, the vehicle at issue in Lewis, Pl. Supp. Notice at 1 (Dkt. 37). FCA has also provided the complaints from Bullock's current representations, and the complaints from cases that Bullock worked on while representing FCA.

However, it offers no more than conclusory allegations that, because these cases involved the same vehicles, Bullock must be using confidential information in her current representations. The complaints themselves consist largely of boilerplate language and, at any rate, do not shed light on what is truly at issue in each case. Without more, this Court will not conclude at this stage that Bullock's former and current representations are substantially related—particularly where the California judges in each of these cases can make such a decision, based on full briefing and consideration of the record before them, if FCA were to bring a motion to disqualify.

Additionally, it must be stressed that FCA is requesting here that Bullock be enjoined from "filing breach of warranty lawsuits on behalf of plaintiff and against FCA US." Pl. Mot. at 15. Although FCA claims that its own policies and procedures apply to all of its breach of warranty claims and "do[ ] not vary from case-to-case," Pl. Supp. Br. at 2-3, this does not mean that all breach of warranty cases embrace the same subject matter or are all substantially related. Given that such cases can turn on multiple different issues, there is no basis for concluding that any breach of warranty action filed by Bullock on behalf of a client is substantially related to her former representation of FCA, so as to give rise to the presumption of using client information.

**\*3** Nor does FCA's misappropriation of trade secrets claim seem promising. FCA alleges that its "breach of warranty strategies and tactics" constitute trade secrets under federal and Michigan law. But a trade secret must not only be a "type[ ] of ... business ... information, including ... processes [and] procedures," it must be something that "derives independent economic value ... from not being generally known to, and not being readily ascertainable through proper means by, another person[.]" 18 U.S.C. § 1839(3); see also Mich. Comp. Laws § 445.1902(d) (similar definition). Much of the information that FCA claims is confidential appears to be readily discernable by a plaintiff's attorney who has opposed FCA in multiple litigations. An attorney working in the field against FCA would learn easily how California law advantages or disadvantages an auto company, what difficulties FCA has experienced with certain expert issues, or what its settlement strategy is.

FCA does not fare better with respect to its breach of contract claim. The Confidentiality Agreement provides that "Confidential Information"—that is, "non-public documents and information disseminated [during the training program]

2018 WL 1064536

that relate to the defense of FCA US"—"shall be used solely for purposes of the defense of California warranty actions against FCA US." See Confidentiality Agreement. In its supplemental brief, FCA elaborates that the "confidential, privileged, and trade secret information" consisted of mental impressions of "plaintiff and FCA witnesses [and] experts," strategies for dealing with certain plaintiff firms, strategies on how it handles cases, why it settles certain cases, how it responds to discovery, its own perceived vulnerabilities, and "pressure points Plaintiff firms exploit." Pl. Supp. Br. at 4 (Dkt. 29). [1]

[1]     FCA also submitted an affidavit stating that FCA shared "its strengths and weakness as it relates to California law; perceived problems with the deposition testimony or availability of FCA US representatives in California warranty litigation matters; discovery orders that FCA US would prefer to avoid complying with by settlement with plaintiffs; and the strategies used by plaintiffs' attorneys that are most effective at driving FCA US to settlement." Decl. of Kris Krueger, Ex. A to Pl. Supp. Br., ¶ 13 (Dkt. 29-2).

However, there is no indication that Bullock has used any of this information presented at this training program for a purpose other than FCA's defense and thereby breached the Confidentiality Agreement. Nor has there been any showing that she will necessarily use such information in the future. To the extent an attorney is presumed to use confidential information from a client in a subsequent representation, the Court reiterates that this presumption applies only when representations are substantially related. And, as previously stated, much if not all of this information seems readily available to any attorney who litigates against FCA.

**B. Irreparable injury, substantial harm to others, and public interest**

FCA argues that it will suffer irreparable harm because the damages flowing from "unfair competition" would be difficult to compute, and because the disclosure of confidential information can never be remedied. Pl. Mot. at 13-14. It is true that, if Bullock does in fact have confidential information from FCA that she subsequently uses against it in litigation, damages flowing from such harm would be difficult to quantify and would constitute irreparable harm. See Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992) ("[A] plaintiff's harm is not irreparable if it is fully compensable by money damages. However, an injury is not

fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate."). However, FCA does have other adequate—and actually better —remedies. FCA may move to disqualify Bullock in any of the litigations pending in California. It may contact the California bar and ask that it take action against Bullock. A restraining order from this Court is not FCA's only avenue of relief. Thus, FCA can avoid much of the harm that it fears through other means and avoid what it claims is irreparable harm.

 **\*4**  Further, the issuance of temporary restraining order would cause harm to others, i.e. to Bullock's existing clients and any other individuals who may want to hire her to represent them in cases against FCA. Those individuals have a presumptive right to an attorney of their choosing, and if they believe that Bullock is the best representative for them, they should be permitted to hire her.

Finally, the public interest would not be well served by the issuance of a temporary restraining order. As stated above, the public in California has a right to choose their attorneys, and prohibiting them from choosing Bullock in any breach of warranty case against FCA, without regard to the similarities between their individual case and whatever confidential information Bullock may have, is not warranted. The public would be better served by having the trial judges in California consider whether, in the context of the particular cases before them, Bullock has violated or likely will violate her ethical obligations. The temporary restraining order requested by FCA is far too broad. See Seto v. Thielen, No. 10-00351, 2010 WL 2612603, at *2 (D. Haw. June 28, 2010) (denying motions for TRO and preliminary injunction where "the requested injunction is simply overbroad" and "[t]he relief requested simply does not fit the alleged violations.").

Accordingly, the balance of the four factors weighs against granting the temporary restraining order.

**III. CONCLUSION**

For the reasons provided, Plaintiff FCA's motion for a temporary restraining order (Dkt. 2) is denied.

SO ORDERED.

2018 WL 1064536

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1064536

---

**End of Document**                                         © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

# ATTACHMENT C

Case 1:22-cv-00531-JMB-SJB ECF No. 5-2, PageID.103 Filed 06/13/22 Page 32 of 50
A Complete Home Care Agency, Inc. v. Gutierrez, Not Reported in N.W.2d (2004)

2004 WL 1459450, 2004-1 Trade Cases P 74,463

2004 WL 1459450

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Appeals of Michigan.

A COMPLETE HOME CARE
AGENCY, INC., Plaintiff-Appellant,

v.

Theresa GUTIERREZ and Atrium Home and
Health Care Services, Inc., Defendants-Appellees.

No. 246280.
|
June 29, 2004.

Before: MURPHY, P.J., and JANSEN and COOPER, JJ.

[UNPUBLISHED]

PER CURIAM.

**\*1** Plaintiff A Complete Home Care Agency, Inc., appeals as of right the order granting defendants Theresa Gutierrez and Atrium Home and Health Care Services, Inc.'s ("Atrium"), motion for summary disposition regarding plaintiff's claims of breach of covenant not to compete and tortious interference with contractual relations pursuant to MCR 2.116(C)(10). We affirm.

I. Facts

Ms. Gutierrez began working for plaintiff in September of 2000, and additionally began working for Atrium on a part-time basis in July of 2001. As a condition of her employment with plaintiff, Ms. Gutierrez signed a covenant not to compete. [1] Through her work for plaintiff, Ms. Gutierrez provided nursing services in the home of Michael Boyagian. Mr. Boyagian required twenty-four hour nursing care, which was provided by employees of both plaintiff and Atrium. In January of 2002, Ms. Gutierrez left the employ of plaintiff to work for Atrium on a full-time basis in order to secure health insurance. At that time, Ms. Gutierrez began providing nursing services in Mr. Boyagian's home on a full-time basis in her capacity as an Atrium employee.

[1]
The covenant was part of plaintiff's employment contracts and also appeared on employee time slips. It provided:

I AGREE AND UNDERSTAND THAT I WILL NOT PERFORM ANY SERVICES FOR THE CLIENT DIRECTLY, OR INDIRECTLY, THROUGH ANOTHER AGENCY, INDIVIDUAL, ENTITY OTHER THAN "A COMPLETE HOME CARE" AGENCY, FOR A PERIOD OF SIX (6) MONTHS AFTER THE LAST DAY WORKED ON ANY OF YOUR ASSIGNMENTS. [Opinion and Order, January 9, 2003, p 3.]

The covenant does not specifically limit the geographical area in which the employee's work is restricted.

Plaintiff brought the instant lawsuit against defendants alleging that Ms. Gutierrez breached the covenant not to compete and that Atrium interfered with its contractual relationship with Ms. Gutierrez. Plaintiff also contended that Atrium had interfered with its contractual relationship with its client, Mr. Boyagian. [2] The trial court granted defendants' motion for summary disposition of all of plaintiff's claims. The trial court held that the covenant was too broad with regard to the type of employment restricted and was, therefore, unreasonable and invalid as a matter of law pursuant to MCL 445.774a. Plaintiff also failed to demonstrate wrongful conduct on the part of Atrium or conduct that was malicious and unjustified at law to support its claim of tortious interference.

[2]
Plaintiff's president, Cynthia Pace, admitted in deposition, however, that it did not have a contract with Mr. Boyagian. [Deposition of Cynthia Pace, July 18, 2002, p 36.] The trial court found the issue abandoned as plaintiff failed to address it in response to defendants' motion for summary disposition. As plaintiff did not present evidence that a contractual relationship existed between plaintiff and Mr. Boyagian to counter Ms. Pace's statement, the trial court properly dismissed this claim.

II. Legal Analysis

We review a trial court's determination regarding a motion for summary disposition de novo. [3] A motion under

Case 1:22-cv-00531-JMB-SJB ECF No. 5-2, PageID.104 Filed 06/13/22 Page 33 of 50
A Complete Home Care Agency, Inc. v. Gutierrez, Not Reported in N.W.2d (2004)
2004 WL 1459450, 2004-1 Trade Cases P 74,463

MCR 2.116(C)(10) tests the factual support of a plaintiff's claim. [4] "In reviewing a motion for summary disposition brought under MCR 2.116(C)(10), we consider the affidavits, pleadings, depositions, admissions, or any other documentary evidence submitted in the light most favorable to the nonmoving party to decide whether a genuine issue of material fact exists." [5] "Summary disposition is appropriate only if there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law." [6]

[3]    *Beaudrie v. Henderson,* 465 Mich. 124, 129; 631 NW2d 308 (2001).

[4]    *Auto-Owners Ins Co v Allied Adjusters & Appraisers, Inc,* 238 Mich.App 394, 397; 605 NW2d 685 (1999).

[5]    *Singer v. American States Ins,* 245 Mich.App 370, 374; 631 NW2d 34 (2001).

[6]    *MacDonald v. PKT, Inc,* 464 Mich. 322, 332; 628 NW2d 33 (2001).

### A. Breach of Covenant Not to Compete

Plaintiff first argues that the trial court erred in finding that the covenant not to compete was legally invalid. We disagree. Plaintiff's covenant is unreasonably broad, and therefore, invalid pursuant to MCL 445.774a.

Agreements not to compete in an employment situation are allowable in Michigan only if they are reasonable. [7] However, courts are circumspect when considering non-compete clauses in employment contracts. [8] MCL 445.774a provides:

[7]    MCL 445.774a; *Thermatool Corp v. Borzym,* 227 Mich.App 366, 372; 575 NW2d 334 (1998).

[8]    See *In re Spradlin,* 274 BR 701, 708-709 (ED Mich, 2002), citing *Woodward v. Cadillac Overall Supply Co,* 396 Mich. 379, 392-393; 240 NW2d 710 (WILLIAMS, J, dissenting), *Bryan v. Lincare, Inc,* 2000 U.S. Dist LEXIS 1109 (ED Mich, 2000) (reasoning that Michigan courts are more hostile to employer/employee non-compete agreements than those involved in the sale of a business).

**\*2** An employer may obtain from an employee an agreement of covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited. [9]

[9]    MCL 445.774a(1).

The six-month duration of a covenant not to compete has been found to be a reasonable time period. [10]

[10]    See *Superior Consulting Co v. Walling,* 851 F Supp 839, 847 (ED Mich, 1994) (finding six-month duration reasonable); *Robert Half Internat'l, Inc v. Van Steenis,* 784 F Supp 1263, 1274 (ED Mich, 1991) (finding one-year duration reasonable).

We must determine, however, whether the covenant which restricts Ms. Gutierrez from performing "any services for the client," is reasonable with regard to the type of employment or line of business restricted. Ms. Pace testified at her deposition that the purpose of the covenant is to prevent former employees from performing *any* service for a client for six months after the termination of her employment, including such services as haircutting, dogwalking or grocery shopping. [11] Because the covenant restricts Ms. Gutierrez from doing *any* kind of work after her termination from plaintiff's employ, the trial court properly found that the restriction is unreasonably broad, and therefore, invalid as a matter of law.

[11]    Deposition of Cynthia Pace, July 18, 2002, pp 26-27.

Plaintiff contends that it would be reasonable, based on the facts of the case, to read the covenant to restrict Ms. Gutierrez from performing any *nursing* services for six months after her termination from plaintiff. We note, however, that MCL 445.774a provides that the court *"may* limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited." [12] The statute does not dictate that a court *must* limit the agreement. "In construing a statute, the words used by the

2004 WL 1459450, 2004-1 Trade Cases P 74,463

Legislature must be given their common, ordinary meaning," and we must apply these unambiguous terms as written. [13] There is no indication in the statute that a trial court was required to reform an unreasonable covenant to "render it reasonable," and therefore, enforceable. Accordingly, the trial court did not err in failing to limit the covenant not to compete.

[12] MCL 445.774a (emphasis added).

[13] *Ligouri v. Wyandotte Hosp & Med Ctr,* 253 Mich.App 372, 376; 655 NW2d 592 (2002), quoting *Veensdra v. Washtenaw Country Club,* 466 Mich. 155, 159-160; 645 NW2d 643 (2002).

B. Tortious Interference with Contractual Relations

Plaintiff also contends that the trial court erred in finding that plaintiff failed to establish a prima facie case of tortious interference with contractual relations. We again disagree.

To establish tortious interference with a business relationship or contract, the plaintiff must prove that the interference was improper by showing that the defendant committed an intentional act which lacked justification and purposely interfered with the plaintiff's contractual rights or business relationship. [14] Improper interference can be established by: "(1) the intentional doing of an act wrongful per se, or (2) the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship." [15] In order to prove that a lawful act was done with malice and without justification, the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference. [16] Actions motivated by legitimate business reasons do not constitute improper motive or interference. [17]

[14] *AOPP v. Auto Club Ins Ass'n,* 257 Mich.App 365, 383; 670 NW2d 569 (2003).

[15] *Id.*

[16] *CMI Internat'l, Inc v. Intermet Internat'l Corp,* 251 Mich.App 125, 131; 649 NW2d 808 (2002); *BPS Clinical Labs v Blue Cross & Blue Shield of Michigan (On Remand),* 217 Mich.App 687, 699; 552 NW2d 919 (1996).

[17] *BPS Clinical Labs, supra* at 698-699.

**\*3** Plaintiff failed to present evidence that Atrium committed an intentional act that was wrongful per se. Ms. Gutierrez testified at her deposition that she applied for work with Atrium, first to pick up additional hours, and then to gain health benefits. [18] Atrium did not solicit Ms. Gutierrez's application nor take improper actions to interfere with her contractual relationship with plaintiff. Accordingly, it was not wrongful per se for Atrium to employ Ms. Gutierrez.

[18] Deposition of Theresa Gutierrez, May 15, 2002, pp 12-14, 19-21.

Plaintiff also failed to create a genuine issue of material fact that Atrium intentionally committed a lawful act with malice or unjustified in law. Atrium's president, Lisa Mazur, admitted in her deposition in a separate, but similar, lawsuit that she assumed employees she hired who were already employed in the health care field were bound by covenants not to compete, but that she hired them anyway. [19] Plaintiff also sent Atrium a letter in February of 2002, informing Atrium of Ms. Gutierrez's covenant not to compete, but Atrium continued to employ Ms. Gutierrez. Even taking all of these allegations as true, plaintiff has not established an improper motive or malice. There is no evidence that Atrium hired Ms. Gutierrez for any reason other than the legitimate business reason of obtaining a qualified employee. Furthermore, as we find the covenant not to compete invalid as a matter of law, Atrium's disregard of the covenant does not amount to malicious or unjustified conduct. Accordingly, the trial court properly granted defendants' motion for summary disposition on this ground.

[19] Deposition of Lisa Mazur, January 30, 2002, pp 21-22. This testimony was given at the same time that Ms. Gutierrez began working for Atrium full-time.

Affirmed.

JANSEN, J. (concurring in part and dissenting in part).

JANSEN, J.

I respectfully dissent from Section II A of the majority opinion, as I would find that the trial court erred in finding that the covenant not to compete was legally invalid. I concur

Case 1:22-cv-00531-JMB-SJB ECF No. 5-2, PageID.106 Filed 06/13/22 Page 35 of 50
A Complete Home Care Agency, Inc. v. Gutierrez, Not Reported in N.W.2d (2004)
2004 WL 1459450, 2004-1 Trade Cases P 74,463

with the majority in all other respects and, thus, I would affirm in part and reverse in part.

On appeal, a trial court's decision on a motion for summary disposition is reviewed de novo. *Dressel v. Ameribank,* 468 Mich. 557, 561; 664 NW2d 151 (2003). Under MCR 2.116(C)(10), summary disposition is proper when "there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds could differ. *Allstate Ins Co v. State,* 259 Mich.App 705, 709-710; 675 NW2d 857 (2003). This Court also reviews questions involving contract construction de novo. *Old Kent Bank v. Sobczak,* 243 Mich.App 57, 61; 620 NW2d 663 (2000).

On review de novo, I would find that the convent not to compete, which was signed by defendant Gutierrez, is enforceable. Agreements not to compete are permissible in Michigan if they are reasonable. MCL 445.774a(1); *Thermatool Corp v. Borzym,* 227 Mich.App 366, 372; 575 NW2d 334 (1998). Pursuant to MCL 445.774a(1):

> **\*4** An employer may obtain from an employee an agreement or covenant which *protects an employer's reasonable competitive business interests* and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is *reasonable as to its duration, geographical area, and the type of employment or line of business.* To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement in order to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited. [Emphasis added.]

Michigan law requires that we narrowly construe restrictive covenants. *United Rentals, Inc v. Keizer,* 355 F3d 399, 408 (CA 6 2004).

The restrictive covenant in question provides:

> I AGREE AND UNDERSTAND THAT I WILL NOT PERFORM ANY SERVICES FOR THE CLIENT DIRECTLY, OR INDIRECTLY, THROUGH ANOTHER AGENCY, INDIVIDUAL, ENTITY OTHER THAN "A COMPLETE HOME CARE" AGENCY, FOR A PERIOD OF SIX (6) MONTHS AFTER THE LAST DAY WORKED ON ANY OF YOUR ASSIGNMENTS.

I agree with the majority, with regard to its finding that a six-month duration is a reasonable time period and, thus, would not support the trial court's grant of summary disposition. See *Superior Consulting Co v. Walling,* 851 F Supp 839, 847 (ED Mich.1994). I would also find that the covenant is reasonable as to geographical area as it is limited to performance of services for plaintiff's clients for which Gutierrez provided service. But I disagree with the majority's finding that the restriction in the covenant is invalid as matter of law because it is unreasonably broad.

The restrictive covenant provides that Gutierrez will not "perform any services for the client." A restrictive covenant, which does not allow an employee to perform services for a client with which that employee provided service for on behalf of the employer he or she is leaving, for a limited period of six months, is not unreasonable. This is a reasonable restriction as to "type of employment or line of business," when read in context. A reading of the terms used in the covenant not to compete make it clear that the agreement was intended to prohibit Gutierrez from performing services for plaintiff's clients, for which she had provided services for during her employment with plaintiff. It is apparent that the restriction is limited to the services Gutierrez provided through her employment with plaintiff. A provision, which limits Gutierrez from performing services for six-months on clients that she serviced for plaintiff was reasonable as to line of work, narrowly restricting services to clients that Gutierrez serviced for plaintiff. This restriction is reasonable in this field of work because Gutierrez and other employees are put in a unique position where they develop personal relationships with the client. Without such restriction an employee could make a deal with the client

A Complete Home Care Agency, Inc. v. Gutierrez, Not Reported in N.W.2d (2004)
2004 WL 1459450, 2004-1 Trade Cases P 74,463

and provide services independently from the employer who put her in contact with the client or, as is the present situation, could leave and go to another agency and take the client to another agency. Plaintiff offered evidence supporting that when Gutierrez terminated her employment with plaintiff she continued performing the same services during the same shift for the client for defendant Atrium as she had on behalf of plaintiff. The provision did not restrict Gutierrez from working in "any capacity for a competitor," see *Superior Consulting Co, supra* at 847, but instead only placed a restriction that if she did work for other agencies or competitors she could not provide services for clients she worked for while employed by plaintiff for a limited period of six months.[1]

[1]     Even assuming that the phrase "any service for the client" is too broad the covenant should have merely been construed against plaintiff in favor of defendant such that "any service" was limited to the services Gutierrez provided to the client while she was employed by plaintiff. See *United Rentals, Inc, supra,* 355 F3d at 407, citing *Higgins v. Lawrence,* 107 Mich.App 178, 309 NW2d 194, 196 (1981).

**\*5** Gutierrez was free to compete in the field, she was just restricted from performing services for the "client" she serviced on behalf of plaintiff. Surely, Michael Boyagian was not the only individual in the area in need of home nursing care. The restrictive covenant did not prohibit plaintiff from gaining full time employment with benefits. Gutierrez was only restricted from performing services for clients she serviced on behalf of plaintiff; i.e., Boyagian.

In addition, the covenant at issue protected plaintiff's "reasonable competitive business interests." MCL 445.774a. The legitimate business interest is the retaining of clients and goodwill. This is clearly a reasonable competitive business interest under the circumstances of this case. Plaintiff places employees in the homes of clients where a situation is created in which it is the employee who develops the relationship with the client. If an employee leaves an employer and gains employment with another home care provider or decides to become an independent contractor it is a legitimate business concern that the client will follow the employee with which the client has developed a relationship. Clearly, this is the type of behavior the restrictive covenant was intended to prohibit.

In *Kelsey-Hayes Co v. Maleki,* 765 F Supp 402, 407, vacated pursuant to settlement 889 F Supp 1583 (ED Mich.1991), the court provided:

> [A] legitimate business interest .... must be something greater than mere competition, because a prohibition of all competition is in restraint of trade. To be reasonable, a covenant must protect against an employee gaining some unfair advantage in competition with his employer. Reasonable covenants may protect such legitimate interests as trade secrets, confidential information, close contact with the employer's customers or customer lists, or cost factors and pricing. An employer may *not* reasonably prohibit future use of general knowledge or skill.

Although, *Kelsey-Hayes Co, supra* has been vacated, the rationale was adopted by the court in *United Rentals, Inc v. Keizer,* 202 F Supp 2d 727 (WD Mich.2002) affirmed 353 F3d 399 (2004) ("the employer's business interest justifying such a restrictive covenant must be greater than mere competition.... In order to be reasonable, a restrictive covenant must protect against the employee's gaining some unfair advantage in competition with his employer, but not prohibit the employee's future use of general knowledge or skill"). The legitimate business interest in the present case is clearly greater than mere competition as the personal relationship an employee develops with plaintiff's clients creates an unfair advantage for employees in competition with plaintiff. The covenant in question protected plaintiff whose employees had close contact with clients and did not prohibit future use of general knowledge or skill. Gutierrez was free to use her general knowledge and skills anywhere and for anyone, except she was not allowed to provide service to clients she had serviced during her employment with plaintiff for a reasonable period of six months. Thus, the covenant not to compete included in Gutierrez's employment contract did not prohibit use of general knowledge and skill she had obtained by working for plaintiff. Therefore, the covenant not to compete that was included in the employment contract protected a reasonable competitive business interest of plaintiff for purposes of MCL 445.774a(1).[2]

2004 WL 1459450, 2004-1 Trade Cases P 74,463

2    In *Tower Oil & Technology Co v. Buckley,* 99 Ill App 3d 637; 425 N.E.2d 1060, 1066-1067; 54 Ill Dec 843 (1981) (quoted and cited favorably in *In re Talmage,* 758 F.2d 162, 165-166 (CA 6 1985)), the appellate court for another state provided that the "protection of an established clientele from takeover by a former employee as a legitimate interest .... neither the existence or misuse of a trade secret is required to enforce a restrictive covenant."

 **\*6** For the above reasons, I would find that the covenant not to compete included in Gutierrez's employment contract is reasonable for purposes of MCL 445.774a, and should have been enforced. I would reverse the trial court's grant of summary disposition in favor of defendants with regard to plaintiff's breach of the covenant not to compete claim. I concur with the majority in all other respects and, thus, I would affirm in part and reverse in part.

**All Citations**

Not Reported in N.W.2d, 2004 WL 1459450, 2004-1 Trade Cases P 74,463

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# ATTACHMENT D

Case 1:22-cv-00531-JMB-SJB ECF No. 5-2, PageID.110 Filed 06/13/22 Page 39 of 50
Actuator Specialties, Inc. v. Chinavare, Not Reported in N.W.2d (2011)
2011 WL 6004068

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by Delphi Automotive PLC v. Absmeier, E.D.Mich., March 1, 2016

2011 WL 6004068
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

ACTUATOR SPECIALTIES, INC., Plaintiff–Appellee,

v.

William CHINAVARE, Defendant–Appellant,
and
Christopher Baker and Patrick Emerson, Defendants.

Docket No. 297915.
|
Dec. 1, 2011.

Monroe Circuit Court; LC No. 08–024921–CZ.

Before: CAVANAGH, P.J., and WILDER and OWENS, JJ.

**Opinion**

PER CURIAM.

**\*1** Defendant, William Chinavare, appeals as of right a permanent injunction that prohibited defendant [1] from working for any competitor of plaintiff, Actuator Specialties, Inc. (ASI), for a period of three years, ending on December 16, 2011. We affirm.

[1] "Defendant" will refer solely to the appellant since the other codefendants are not involved on appeal. In fact, codefendant Patrick Emerson was voluntarily dismissed by ASI, and codefendant Scott Baker was dismissed via the trial court granting summary disposition in Baker's favor.

I. BASIC FACTS

Randy Wright and Wendy Wright are the co-owners of ASI and employ nine people. ASI is in the business of selling and repairing valve actuators, manufacturing and selling valve/ actuator parts, and assembling and selling kits of valve/ actuator parts. An actuator is a mechanical and electrical device that opens and closes valves. As an actuator's parts wear out, they must either be replaced or repaired.

Defendant was hired at ASI in January 2003, and before he resigned, he was the general manager. In fact, defendant was considered "in charge" when Randy was not present. In March 2007, to aid in the handling of after-hour calls, defendant copied ASI files onto a USB drive he purchased. Defendant testified that when he returned home, he realized his (old) computer did not have a USB port, and that he could not transfer and use the data. Defendant said that as a result of being unable to use the USB drive, he simply stored the USB drive in a closet.

Later, on January 18, 2008, all three codefendants quit to begin working for Phoenix Partners, LLC, which did business as Renew Valve and Cleveland Valve & Gauge. [2] After the codefendants left ASI, Wendy discovered that some confidential files defendant would have had no reason to access, had been recently accessed on the ASI computer previously assigned to defendant. ASI sought a Temporary Restraining Order (TRO) on February 12, 2008, and the requested order was issued on February 15, 2008. The salient portions of the TRO required the following of the codefendants:

[2] Referred to hereafter as "Renew Valve."

A. They shall immediately deliver to [ASI] all originals and all copies of documents and data acquired from ASI, whether in hard copy or stored in other media, referring or related to ASI's parts, kits, suppliers, customers, or financial matters;

[section B was crossed out]

C. They shall not access or transmit any data to the internal computer network of any person or entity whose business offers goods or services competitive with ASI's, including but not limited to Renew Valve & Machine Co. and/or Cleveland Valve & Gauge, or any computer in the possession or control of any person employed by them or affiliated with them;

D. They shall not disclose, orally, electronically or in writing, any information to Renew Valve & Machine Co. and/or Cleveland Valve & Gauge, or any person

employed by them or affiliated with them, any information the defendants acquired from ASI or derived from its documents or data, related to its parts, kits, suppliers, customers, or financial matters;

[section E was crossed out]

F. They shall not use, or disclose to anyone, information acquired during the course of their employment for ASI, or derived from its documents and data, that they have retained in their memory related to ASI's parts, kits, suppliers, customers, or financial matters;

**\*2** [section G was crossed out]

H. They shall preserve all notes and other records and copies of all written and email communications among themselves referring or relating ASI's business, or referring or related to Renew Valve & Machine Co. and/or Cleveland Valve & Gauge, or any person employed by them or affiliated with them, and all notes and other records and copies of all written and email communications with Renew Valve & Machine Co. and/or Cleveland Valve & Gauge, or any person employed by them or affiliated with them which has been sent by or to any defendant;

[section I was crossed out]

J. They shall preserve, and not destroy or delete any documents or data which they have been ordered to preserve or deliver to ASI by this order; and

K. They shall immediately deliver to ASI all parts, kits, gaskets, kit breakdown sheets, tools, logo apparel, logo gratuities, uniforms and other property that they acquired from ASI or from a customer or supplier of ASI.

Notably, the TRO did *not* prohibit defendant from working for Renew Valve.

On February 13, 2008, one day after the TRO had been sought, defendant uploaded the data contained on the USB drive onto his Renew Valve computer. Defendant also changed the heading on an ASI order form he had copied to create a "Renew Valve" order form. Then on February 15, 2008, the date the TRO was issued, defendant faxed the newly created Renew Valve order form to a vendor. The vendor received the fax and sent a reply fax on February 18, 2008. However, the vendor mistakenly sent the reply fax to ASI because that is the company where it associated defendant's name. After ASI received the fax, Wendy recognized that

defendant was using a form that appeared to have been derived from ASI forms, in apparent violation of the TRO that had been issued three days earlier. [3]

[3]     Even though the revised order form sorted the data differently and had Renew Valve's name on the letterhead, the form contained the same content as ASI's form, including the same typos.

A computer forensics company hired by ASI to conduct an analysis concluded that there were hundreds of ASI files on either defendant's USB drive or on Renew Valve's computers and that, in addition, a missing or unidentified USB drive [4] had been inserted into defendant's ASI computer and later inserted into four computers at Renew Valve. This device has not been produced in the course of this litigation.

[4]     It is unknown whether the unidentified "USB drive" was an actual "thumb drive," but regardless of its physical characteristics (such as being a thumb drive, SD card, or phone with a flash card), it was a flash-memory device.

After the trial court granted the TRO, it held seven days of evidentiary hearings to determine whether a preliminary or permanent injunction should issue. At the conclusion of the hearings, the trial court issued a preliminary injunction enjoining defendant from working at Renew Valve, or any similar competitor of ASI, for a period of three years, ending on December 16, 2011. On March 10, 2010, defendant requested that the trial court either dismiss the preliminary injunction or, in the alternative, convert it into a permanent one, such that an appeal of right could be taken. The trial court determined that the reasons for the injunction were still valid and converted the preliminary injunction into a permanent injunction, which kept the three-year prohibition of work.

## II. ANALYSIS

**\*3** A trial court's decision to grant an injunction is reviewed for an abuse of discretion. *Mich Coalition of State Employee Unions v. Mich. Civil Service Comm'n,* 465 Mich. 212, 217; 634 NW2d 692 (2001). A trial court abuses its discretion when its decision falls outside the range of principled and reasonable outcomes. *Maldonado v. Ford Motor Co,* 476 Mich. 372, 388; 719 NW2d 809 (2006).

**Actuator Specialties, Inc. v. Chinavare, Not Reported in N.W.2d (2011)**

2011 WL 6004068

Defendant argues that the trial court abused its discretion when it enjoined defendant from working at Renew Valve for a period of three years. We disagree.

At the outset, defendant does not contend that any of the trial court's factual findings were erroneous or that an injunction was not warranted. Instead, defendant only argues that a single provision in the injunction, preventing him from working at any competitor of ASI, was improper. We also note that defendant's brief on appeal included an affidavit that was not presented to the trial court. Because defendant did not move to amend the record pursuant to MCR 7.216(A)(4) and review is limited to the record presented to the trial court, we will not consider it. *Mich AFSCME Council 25 v. Woodhaven–Brownstown School Dist,* —— Mich.App ——; —— NW2d —— (Docket No. 299945, issued May 3, 2011), slip op, p 1.

Michigan's Uniform Trade Secrets Act (MUTSA), MCL 445.1901 et seq ., authorizes the use of injunctive relief. MCL 445.1903 provides the following:

> (1) Actual or threatened misappropriation may be enjoined. Upon application to the court of competent jurisdiction, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

* * *

> (3) In appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order.

For a party to obtain an injunction under the premise of "threatened misappropriation" of trade secrets, "the party must establish more than the existence of generalized trade secrets and a competitor's employment of the party's former employee who has knowledge of trade secrets." *CMI Int'l, Inc v. Intermet Int'l Corp,* 251 Mich.App 125, 134; 649 NW2d 808 (2002). Here, ASI did just that. ASI showed that not only did defendant possess confidential ASI data, defendant also downloaded that data onto Renew Valve's computer system and utilized that data for the benefit of Renew Valve. In addition, despite the knowledge of the entry of a TRO that specifically compelled defendant to turn over such data to ASI, defendant failed to do so. Significantly, defendant did not admit to having an ASI USB drive or return it to ASI until

ASI learned of defendant's use of an ASI electronic form and confronted Renew Valve with the information.

Defendant's behavior is similar to the behavior of the defendant in the Seventh Circuit case of *PepsiCo, Inc v. Redmond,* 54 F3d 1262 (CA 7, 1995). [5] This Court previously summarized *PepsiCo* as follows:

[5] The trial court relied upon *PepsiCo* in entering the permanent injunction in ASI's favor.

> **\*4** In that case, the plaintiff sought a preliminary injunction against another company and its employee to prevent its employee, a former employee of plaintiff who had signed a confidentiality agreement, from divulging plaintiff's trade secrets and confidential information and from assuming specific duties. *Id.* at 1263, 1264. A statute in Illinois that is similar to Michigan UTSA "provides that a court may enjoin the 'actual or threatened misappropriation' of a trade secret." *Id.* at 1267. The Seventh Circuit Court of Appeals explained that a "plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *Id.* at 1269. The Seventh Circuit Court of Appeals affirmed the district court's grant of a preliminary injunction, finding that the plaintiff established a sufficient likelihood of success despite the lack of evidence that the defendant had used or planned to use any trade secrets. *Id.* at 1271. However, the employee in PepsiCo demonstrated a lack of trustworthiness beyond his decision to work for a competitor. *Id.* at 1270. [*CMI Int'l,* 251 Mich.App at 133 (footnote omitted).]

In *PepsiCo,* the "lack of trustworthiness" was evidenced by the former employee accepting a position with a competitor, while still employed at PepsiCo, and lying to PepsiCo and his colleagues about it. *PepsiCo,* 54 F3d at 1264. The district court explained:

> Redmond's lack of forthrightness on some occasions, and out and out lies on others, in the period between the time he accepted the position with [PepsiCo's competitor] and when he informed plaintiff that he had accepted that position leads the court to conclude that defendant Redmond

could not be trusted to act with the necessary sensitivity and good faith under the circumstances in which the only practical verification that he was not using plaintiff's secrets would be defendant Redmond's word to that effect. [*Id.* at 1270.]

The district court also pointed out that the potential new employer seemed to express an "unnatural interest" in hiring PepsiCo employees. *Id.* at 1271. The district court determined that this showed a willingness on part of the new employer to seek out and use PepsiCo's trade secret information. *Id.*

Here, defendant's conduct raises the same warning flags regarding his willingness to use trade-secret information. First, Wendy testified that within the three days before defendant's resignation, someone used defendant's computer to access many confidential computer files that defendant would not have had a reason to access during that time. Second, despite knowing that a TRO was being sought and thereafter was issued, defendant claims that he failed to recognize or did not "think" that the USB drive that he copied the ASI files onto was covered under the TRO. This explanation rings hollow in the face of the incredible coincidence that defendant brought the USB drive into work and copied the ASI files to the Renew Valve computer one day after the TRO was sought, two days before the TRO was issued. Third, defendant altered one of the ASI files by replacing the ASI letterhead with his new employer's name, "Renew Valve," showing a willingness to use information surreptitiously taken from ASI. Further, in addition to the fact that 462 ASI files were found on either defendant's USB drive or on Renew Valve's computers, the evidence showed that only some of the files downloaded to a second, missing or unidentified, USB device from defendant's ASI computer, and later inserted into four computers at Renew Valve, were downloaded onto the Renew Valve computers. Because this second device is still unaccounted for, and its content is unknown, the trial court did not err in finding a lack of trustworthiness on defendant's behalf.

**\*5** Finally, similar to PepsiCo's competitor, the evidence showed that there was questionable behavior by Renew Valve to add support to a finding of lack of trustworthiness sufficient to support the employment prohibition ordered by the trial court. In addition to hiring the three codefendants away from ASI at the same time, Renew Valve used refreshed portions

of a PowerPoint presentation created by ASI as its own. The trial court could properly infer that Renew Valve's willingness to use ASI materials that it does not own or have permission to use indicates Renew Valve's willingness to misappropriate trade secret information.

We conclude on this record therefore, that the trial court did not abuse its discretion in finding that ASI had established a willingness to use and/or disseminate trade-secret data, such that entry of an injunction to prevent any threatened misappropriation of trade secrets was warranted. MCL 445.1903(1).

Defendant next claims that the three year prohibition of working for a competitor is unprecedented. While there are no cases directly on point, the Michigan Supreme Court did imply that temporary work restrictions are valid. In *Hayes–Albion v. Kuberski*, 421 Mich. 170, 188–189; 364 NW2d 609 (1984), the Court found that a *perpetual* ban on the defendant from working in a particular industry was improper and "too restrictive because it prohibits defendants from competing with plaintiff even if plaintiff's trade secrets become common knowledge." *Id.* at 189. Thus, *Hayes–Albion* stands for the proposition that an employment ban that "fail[s] to strike the proper balance," *Id.* at 188, is improper. Here, because the period of the injunction was limited to three years and was not permanent, the trial court's order does not run afoul of the concerns raised in *Hayes–Albion*.

MCL 445.1903(1) allows for injunctive relief to last "for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation." This "reasonableness" standard is similar to how courts enforce covenants not to compete. Such covenants must also be "reasonable" in light of the surrounding circumstances. *Coates v. Bastian Bros, Inc,* 276 Mich.App 498, 506; 741 NW2d 539 (2007).

Here, ASI presented evidence that defendant had a willingness to access and/or use confidential information that was taken from ASI and that there was still an unaccounted USB storage device. Thus, the potential harm to ASI was severe if defendant was allowed to continue to work for Renew Valve. On the other hand, the potential harm to defendant was minimal. Defendant testified that he had "plenty of places" he could have worked instead of Renew Valve and could have made nearly the same $95,000 salary. Additionally, ASI presented evidence that its data took over ten years to compile. Thus, the fact that the trial court

2011 WL 6004068

only imposed a three-year restriction makes the limitation facially reasonable with respect to its duration. See MCL 445.1903(1); *Television Telecomm Sys, Inc v.. Saindon,* 522 NW2d 1359, 1366 (Ill App, 1988) (injunctions should not last longer than the time required to duplicate the product by lawful means).

**\*6** In sum, because ASI established a threat of misappropriation, the MUTSA permitted the trial court to enjoin defendant from working for a competitor of ASI. And furthermore, the three-year limitation was reasonable

when considering all of the circumstances as a whole. As a result, defendant cannot show how the trial court abused its discretion when it fashioned this relief to ASI, and defendant's claim fails. Plaintiff, being the prevailing party, may tax costs pursuant to MCR 7.219.

Affirmed.

**All Citations**

Not Reported in N.W.2d, 2011 WL 6004068

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

**ATTACHMENT E**

2010 WL 4628643
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

SPARTAN GRAPHICS, INC., Plaintiff–Appellant,

v.

ENTERMARKET CORPORATION,

Defendant–Appellee,

and

George Schmutz, Defendant.

Docket No. 292235.
|
Nov. 16, 2010.

West KeySummary

1　Compromise, Settlement, and
Release 🔑 Antitrust, trade regulation, fraud,
and consumer protection

89　Compromise, Settlement, and Release
89III　Construction, Operation, and Effect
89III(B)　Matters Included or Affected
89k413　Particular Subjects, Claims, and Disputes
89k420　Antitrust, trade regulation, fraud, and
consumer protection
(Formerly 331k33 Release)

Language in the release agreement executed by
a design corporation, print broker, and product
services corporation, settling claims between
them, did not preclude the design corporation's
misappropriation of trade secrets claim against
the print broker. A former employee of the
design corporation began working for the print
broker before the release was signed, and
thus, could have misappropriated trade secrets.
Moreover, an exception was inserted into the
release agreement, designed to retain an action
against the former employee, because the design
corporation knew at the time the release was
executed that former employee was violating his
non-competition agreement.

Kent Circuit Court; LC No. 09–000170–CZ.

Before: O'CONNELL, P.J., and SERVITTO and SHAPIRO,
JJ.

**Opinion**

PER CURIAM.

**\*1** This litigation arises from claims of trade secret
misappropriation. Plaintiff appeals by leave granted the
trial court's April 15, 2009 interlocutory order granting
defendant EnterMarket Corporation's motion for partial
summary disposition and dismissing plaintiff's claims against
EnterMarket for misappropriation of trade secrets (Count II),
tortious interference with a contract (Count III), and tortious
interference with an advantageous business relationship
(Count IV) on the grounds that they were barred by a prior
release. We affirm the trial court's dismissal of Count III, but
reverse and remand as to Counts II and IV.

## I. BACKGROUND

Plaintiff, a Michigan corporation, designs, produces, and
sells specialty printed materials, including graphic decals,
stickers, signs, posters, appliqués, and other recognition
products to distributors, retainers, and end users. In the late
1990s, Goodren Product Services Corporation, a New Jersey
corporation that sells design and manufacturing services, but
subcontracts the actual design and manufacturing to vendors,
began using both plaintiff and Continental Identification
Products, Inc (CIP) as print vendors.

In 2000, as a result of a bankruptcy of one of Goodren's
principal customers, Goodren was unable to pay plaintiff
and CIP for products it had purchased from both and sold
to the now bankrupt customer. Goodren owed plaintiff and
Continental a combined debt of approximately $366,515.
Although Goodren, plaintiff, and CIP entered into an
agreement for repayment of the debt, which was subsequently
revised, Goodren ceased doing business in 2005, leaving the
debt largely unpaid. On January 1, 2006, EnterMarket, a
New York corporation and print broker, hired Jeffrey Kahn,
Goodren's principal, to be its vice president. EnterMarket

2010 WL 4628643

used plaintiff and CIP as one of its print vendors in 2005 and 2006.

On February 16, 2007, plaintiff and CIP filed suit against Goodren and EnterMarket in Kent Circuit Court. Goodren and EnterMarket had the suit removed to the United States District Court for the Western District of Michigan. Plaintiff and CIP alleged that Goodren had merged with EnterMarket, with EnterMarket agreeing to assume the Goodren debt. As a result of facilitated mediation in April 2008, the parties agreed to settle the suit for payment by EnterMarket of $84,500. The parties memorialized the terms in a document captioned "Settlement Agreement and Mutual Release" (the settlement agreement) which was signed by EnterMarket's representative on May 6, 2008, and plaintiff's representative on May 20, 2008.

The last paragraph of the "Recitals" portion of the settlement agreement provides:

> R. The Parties wish to fully and completely resolve any and all claims which have been brought or which could have been brought in the Lawsuit or in connection with the business relationships between the parties.

The actual terms of the settlement agreement follow the recitals and contain, among other things, the releases made by the parties. Paragraph 2 provides:

> *2 Release by Plaintiffs: Plaintiffs, for themselves, their officers, directors, owners, employees, parents, subsidiaries, affiliate companies, sureties, successors and assigns, hereby release and forever discharge Defendants and their parents, subsidiaries, affiliate companies, and all of their respective officers, directors, employees, agents, attorneys, sureties, insurance companies, successors and assigns, from any and all claims, liens, claims of lien, actions, causes of action, debts,

obligations, warranties, demands and costs of any kind or nature whatsoever, known or unknown, accrued or unaccrued, that were, could have been, or might have been asserted by the Plaintiffs in the Lawsuit or in any forum in connection with, arising out of, related to, based upon, in whole or in part, directly or indirectly: (a) any allegation, transaction, fact, matter, circumstance, occurrence, representation, action, omission or failure to act that was alleged, involved, set forth, referred to or could have been alleged in the Lawsuit; or (b) any business transaction, business relationship, or business dealings between Plaintiffs and the Defendants though [sic] the date of the execution of this Agreement. Notwithstanding the above, by entering into this Settlement Agreement and Release, Plaintiffs do not release or waive any claims they may have against George Schmutz or any other former employee of Plaintiffs.

On January 7, 2009, plaintiff initiated the instant litigation against EnterMarket and George Schmutz in Kent Circuit Court. Plaintiff alleged that it employed Schmutz for more than 18 years as its operations manager in its sales department and that Schmutz had continuous, direct contact with plaintiff's current and potential customers, had access to all of plaintiff's pricing information and sales strategies, and had access to plaintiff's confidential and proprietary information relating to customers, customer prospects, customer contacts, business plans, sales strategies, and pricing information. Plaintiff further alleged that, as a condition of his employment, Schmutz entered into a non-competition agreement with plaintiff.

According to plaintiff, Schmutz resigned from his position with plaintiff in June 19, 2006. Plaintiff alleged that it learned in March 2008 that EnterMarket, a direct competitor of plaintiff in the business of commercial printing and fulfillment services, had hired Schmutz. Plaintiff also alleged that it learned in September 2008 that Schmutz was actively

*Spartan Graphics, Inc. v. Entermarket Corp., Not Reported in N.W.2d (2010)*

2010 WL 4628643

soliciting business from customers he had serviced while employed by plaintiff, using his knowledge of plaintiff's confidential and proprietary information and his contacts with, and knowledge relating to, plaintiff's customers to solicit millions of dollars in sales from plaintiff's customers for EnterMarket.

Plaintiff's complaint alleged three counts against EnterMarket: Count II for misappropriation of trade secrets, Count III for tortious interference with a contract by employing Schmutz in violation of the non-competition agreement, despite knowledge of its existence, and Count IV, tortious interference with an advantageous business relationship. EnterMarket moved for summary disposition under MCR 2.116(C)(7), asserting that plaintiff's claims against it were barred by the settlement agreement, and alternatively under MCR 2.116(C)(8), asserting that plaintiff had failed to state a claim upon which relief could be granted. EnterMarket attached interrogatory answers from the federal lawsuit which disclosed that Schmutz began serving as a consultant to EnterMarket in late 2006, and was hired by EnterMarket on January 1, 2007 to be its president.

**\*3** The trial court held a hearing on the motion on April 2, 2009 and granted the motion as to Counts II, III and IV, holding:

> The Court notes, parenthetically, that without question Count 3 and Count 4 are covered by the release by the plaintiffs. There's no question in the Court's mind. Clearly, they deal with the relationship between the parties predating May 20th, 2008, and there's no—any potential cause of action was known on signing of the settlement release agreement. It was a release of all claims as of the date of the execution of the agreement pursuant to Subparagraph (b) of the Paragraph 2 of the agreement, and therefore Counts 3 and 4, which allege claims that arise under June 19, 2006 actions of Co–Defendant George Schmutz, clearly are barred by the settlement release agreement under MCR 2.116(C)(7).

> The more difficult analysis is—relates to Count 2. In Count 2, this is the tortious interference, and the comments of Mr. Dougherty are very thoughtful and well-presented ... that his position being, as I understand it, that because of the date of the execution of the agreement limiting language of Subparagraph 2(b), there could not be continued—there could not be a bar to the claims in Count 2 after May 20th, 2008.

The Court, however, looks at the language of the entire document, the release agreement. In it, the plaintiffs agree to release any claims for "demands and costs of any kind or nature whatsoever, known or unknown, accrued or unaccrued, that were, could have been, or might have been asserted by the plaintiffs in the lawsuit or in any forum in connection with, arising out of, related to, based upon, in whole or in part, directly or indirectly."

The Court draws its attention to the "arising out of, related to," and related in while—"related to, in whole or in part, directly or indirectly" language, very, very broad language, "of any allegation, transaction, fact, matter, circumstances, occurrence, representation, action, omission, or failure that was alleged, involved, set forth, referred to, or could have been alleged in the lawsuit."

That required the Court to turn back the hands of time to May 20, 2008. May 20, 2008, there was knowledge that Mr. Schmutz was working for the competitor, and there was apparently a belief that there w[ere] violations of trade secrets going on. That's related to. That's arising out of. That's direct and indirect.

\* \* \*

What's the intent of the parties? It's evidence by the specific language, but—that I've already referenced, but it's also evidence by the specific language as pointed out by Counsel Holaday in Subparagraph 4 of the—or Subparagraph R ... where "the parties wish to fully and completely resolve any and all claims which have been brought or which would have been brought in the lawsuit or in connection with the business relationships between the parties." It appears that it was a desire to have a permanent, lasting, effective divorce between the parties who were litigants against—a commercial divorce to avoid further litigation.

> **\*4** I'm satisfied that the release encompasses that which is alleged in Counts 2, 3, and 4.

Plaintiff immediately sought clarification regarding whether the trial court's ruling included tortious interference activity committed by EnterMarket after May 20, 2008. The trial court answered affirmatively, "because it is the Court's belief that based on the complaint as filed, ... you were aware of this

tortious conduct going forward at the time on May 20 by virtue of the employment and his position and participation in this industry."

Plaintiff moved for reconsideration under MCR 2.119(F), arguing that although it knew by May 28, 2008 [1] that EnterMarket employed Schmutz, it had no knowledge of any misappropriation or use of its trade secrets at that time, and that it did not learn that EnterMarket and Schmutz had misappropriated its trade secrets until September 2008. Thus, plaintiff argued, it could not have included its misappropriation claims in the federal action, such that the language in the settlement agreement did not bar the claim. The trial court denied the motion as untimely, but further held that even if the motion had been timely, it would still have denied the motion because of the broad language of the release.

[1] Plaintiff refers throughout its brief to the "May 28, 2008 release." However, the record indicates that plaintiff's representative signed the settlement agreement on May 20, 2008, and the trial court relied on plaintiff's knowledge as of May 20, 2008. Accordingly, the pertinent date is May 20, 2008, not May 28, 2008.

Plaintiff filed an application for leave to appeal the trial court's grant of summary disposition, which this Court granted. *Spartan Graphics, Inc v. EnterMarket Corp,* unpublished order of the Court of Appeals, entered December 1, 2009 (Docket No. 292235).

## II. SUMMARY DISPOSITION

Plaintiff alleges that the trial court erroneously granted summary disposition. We review de novo both a trial court's decision to grant summary disposition, *Michigan Federation of Teachers v. Univ. of Michigan,* 481 Mich. 657, 664, 753 N.W.2d 28 (2008), and the interpretation of the terms of a release. *Cole v. Ladbroke Racing Michigan, Inc.,* 241 Mich.App. 1, 13, 614 N.W.2d 169 (2000).

"[T]he scope of a release is governed by the intent of the parties as expressed in the release." *Collucci v. Eklund,* 240 Mich.App. 654, 658, 613 N.W.2d 402 (2000). Where the text is unambiguous, the parties' intentions are ascertained from the plain language of the release. *Id.* "The fact that the parties dispute the meaning of a release does not, in itself, establish

an ambiguity." *Cole,* 241 Mich.App. at 14, 614 N.W.2d 169. Rather, a release is ambiguous only when its language is reasonably susceptible to more than one interpretation. *Id.* at 13, 614 N.W.2d 169.

The trial court granted summary disposition pursuant to MCR 2.116(C)(7). Summary disposition under MCR 2.116(C)(7) is appropriate where a claim is barred by a release. *Cole,* 241 Mich.App. at 13, 614 N.W.2d 169. A party may support or oppose a motion under MCR 2.116(C)(7) with affidavits, depositions, admissions, or other documentary evidence, but the substance or content must be admissible evidence. *By Lo Oil Co v. Dep't of Treasury,* i267 Mich.App 19, 26; 267 Mich.App. 19, 703 N.W.2d 822 (2005). "The allegations of the complaint are accepted as true unless contradicted by documentary submissions." *Id.* Summary disposition is properly granted under (C)(7) if the undisputed facts establish that the claim has been released. See *id.*

**\*5** The trial court, relying on plaintiff's complaint, concluded that Counts II, III and IV of plaintiff's complaint against EnterMarket were barred by the release because those claims "could have been" advanced by plaintiff in the federal lawsuit by amendment because plaintiff knew by March 2008 that Schmutz was employed by EnterMarket. Plaintiff's complaint provides:

> On or about March 2008, Spartan learned that Schmutz has gone to work for EnterMarket, a direct competitor of Spartan. On or about September 2009, Spartan learned that Schmutz was actively soliciting Spartan employees and business form customers whom he had serviced while employed by Spartan.

As previously noted, we must accept these allegations as true because they were not contradicted by any documentary evidence. *By Lo Oil Co.,* 267 Mich.App. at 26, 703 N.W.2d 822.

Looking first at Count III, plaintiff alleged that EnterMarket tortiously interfered with a contract by employing Schmutz in violation of the non-competition agreement, despite EnterMarket's knowledge of the agreement. However, because plaintiff's complaint concedes that it was aware

in March 2008 that EnterMarket had hired Schmutz, any violation of the non-competition agreement occurred prior to the May 20, 2008 execution of the settlement agreement. Accordingly, the trial court properly concluded that Count III was barred by plaintiff's release.

However, looking at Counts II and IV, which involve the misappropriation of trade secrets and tortious interference with business relationships with plaintiff's clients based on that misappropriation, we conclude that, because there was no evidence to support a finding that EnterMarket was misappropriating plaintiff's trade secrets prior to May 20, 2008, the trial court granted summary disposition prematurely. The fact that Schmutz began working for EnterMarket before May 20, 2008 does not permit the reasonable inference that he also engaged in the alleged unauthorized use of plaintiff's trade secrets before May 20, 2008. Although EnterMarket had hired Schmutz well before the release was signed, which placed him in a position where he *could have* misappropriates trade secrets during the pendency of the federal lawsuit, it does not logically follow that he *actually was* so engaged. Such a conclusion is mere speculation without any factual or evidentiary support.

Defendant argues that plaintiff's carving out an exception to the release to be able to sue Schmutz was evidence that plaintiff was aware of his unlawful actions. We disagree. Plaintiff knew at the time the release was executed that Schmutz was violating his non-competition agreement. Thus, the exception contained in the release can be explained by plaintiff's wish to retain an action against Schmutz for that violation; it does not require that plaintiff was aware of misappropriation of trade secrets or solicitation of plaintiff's clients. Indeed, the record indicates that the trial court was aware of this problem. When EnterMarket's counsel initially tried to argue that plaintiff knew about the misappropriation in May 2008, the trial court indicated that simply because Schmutz had the knowledge at the time he was hired did not mean that he was using it: "But what if he's not using it at that point, or what if he's not using it in such a way that it's demonstrably harming the former employee?"

**\*6** According to the record, plaintiff has not alleged a specific date when Schmutz allegedly began the unauthorized use of plaintiff's trade secret. Rather, its complaint simply indicates that plaintiff only became aware of the misappropriation in September 2008, more than three months after plaintiff's execution of the settlement agreement. The evidence supplied by EnterMarket does not demonstrate that

Schmutz engaged in the unauthorized use of plaintiff's trade secrets, let alone that he did so before May 20, 2008. Thus, there is no evidence in the record to support the conclusion that Schmutz engaged in misappropriation of trade secrets prior to the execution of the settlement agreement, such that plaintiff could have amended the federal lawsuit to allege Counts II and IV. Further, although not evidence, plaintiff's counsel's represented to the trial court that plaintiff believes "most of [the trade secret misappropriation] has occurred within the last nine months or so," which would mean it began in August 2008, well after the settlement agreement was signed.

At oral argument, the parties disputed the application of the release language related to "known or unknown" claims. EnterMarket argued that when plaintiff became aware of the misappropriation of trade secrets was irrelevant because the release used broad language that released all claims "known or unknown." However, we agree with plaintiff that EnterMarket's interpretation is overly broad in light of the explicit limitations contained in the release paragraph. EnterMarket focuses on the beginning language of the release which provides, a release of "any and all claims ... actions, causes of action ... of any kind or nature whatsoever, known or unknown, accrued or unaccrued, that were, could have been, or might have been asserted by the Plaintiffs in the Lawsuit or in any forum." However, it ignores that this broad language is limited by the next phrase which limits that broad release to claims:

> arising out of, related to, based upon, in whole or in part, directly or indirectly: (a) any allegation, transaction, fact, matter, circumstance, occurrence, representation, action, omission or failure to act that was alleged, involved, set forth, referred to or could have been alleged in the Lawsuit; or (b) any business transaction, business relationship, or business dealings between Plaintiffs and the Defendants though [sic] the date of the execution of this Agreement.

Thus, whatever claims, known or unknown, that could have been brought in the Lawsuit or in any other forum were

Spartan Graphics, Inc. v. Entermarket Corp., Not Reported in N.W.2d (2010)
2010 WL 4628643

required to arise from or relate to something that "could have been alleged in the Lawsuit" under subsection (a). The "or in any forum" language is not made nugatory, as it is necessary for subsection (b) which includes no limitations on being brought in the Lawsuit. Thus, while plaintiff's interpretation gives reasonable meaning to each aspect of the release, EnterMarket's broad interpretation would have us ignore all of the subsequent language contained in the release after "in any forum." We cannot accept an interpretation that renders release language nugatory. See *Klapp v. United Ins. Group Agency, Inc.,* 468 Mich. 459, 468, 663 N.W.2d 447 (2003) ("[C]ourts must also give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory."). Thus, when plaintiff became aware of the trade secret misappropriation is relevant and the "known or unknown" release language does not automatically preclude the claim. Rather, it is necessary to determine when plaintiff became aware of the alleged misappropriation.

*7 At this stage, discovery is necessary to determine whether and when any misappropriation occurred. Only after discovery is completed can it be determined whether the release bars Counts II and IV against EnterMarket. Accordingly, we conclude that the grant of summary disposition as to Counts II and IV was premature and remand for discovery and other proceedings not inconsistent with this opinion. [2]

[2]    We have not addressed whether summary disposition was proper under MCR 2.116(C)(8) because the trial court indicated that plaintiff's claims were not deficient and EnterMarket has not appealed that decision.

CONCLUSION

We affirm the trial court's grant of summary disposition in favor of EnterMarket as to Count III, but reverse as to Counts II and IV and remand for discovery and additional proceedings not inconsistent with this opinion. We do not retain jurisdiction. No costs, neither party having prevailed in full. MCR 7.219.

O'CONNELL, J., (concurring in part and dissenting in part). I concur with the majority's decision to affirm the dismissal of Count III. I disagree, however, with the majority's resuscitation of Counts II and IV. Because plaintiff relinquished any right to pursue those claims, I would affirm the trial court's dismissal of all three counts.

As this Court has repeatedly explained, "[a]n agreement to settle a pending lawsuit is a contract, governed by the legal rules applicable to the construction and interpretation of other contracts ." *Reicher v. SET Enterprises, Inc.,* 283 Mich.App. 657, 663, 770 N.W.2d 902 (2009). This Court enforces settlement agreements according to the plain terms of the agreements. *Id.* at 664–665, 770 N.W.2d 902. Further, "this Court must honor the parties' contract, and not rewrite it." *Id.* at 665, 770 N.W.2d 902.

Here, the parties freely entered into a binding settlement agreement in which plaintiff released and forever discharged defendant from all claims "known or unknown, accrued or unaccrued." Plaintiff now seeks to rewrite the release by transplanting a date limitation into the governing provision. The transplantation would undoubtedly sweeten the settlement agreement for plaintiff, but would also impermissibly alter the plain terms of the agreement. In my view, this Court should not allow plaintiff to create a hybrid apple from which to take a second proverbial bite, however sweet. I would affirm the trial court.

**All Citations**

Not Reported in N.W.2d, 2010 WL 4628643

End of Document    © 2022 Thomson Reuters. No claim to original U.S. Government Works.